**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

KIRK DOUGLAS, individually and on behalf of
all others similarly situated,

                  Plaintiff,

v.

ALLIED UNIVERSAL SECURITY SERVICES,
ALLIED BARTON SECURITY SERVICES LLC
and ALLIED SECURITY HOLDINGS LLC,

                  Defendants.

Civil Action No.  17-cv-6093

**CLASS AND COLLECTIVE ACTION**
**COMPLAINT FOR DAMAGES,**
**RESTITUTION AND INJUNCTIVE**
**RELIEF**

**JURY TRIAL DEMAND**

      Plaintiff Kirk Douglas, individually and on behalf of all others similarly situated, by

his attorneys, The Law Office of Christopher Q. Davis, PLLC, allege, upon personal

knowledge and upon information and belief as to other matters, as follows:

## NATURE OF ACTION

      1.     This is a collective and class action brought by Lead and Putative Class

Representative Kirk Douglas (the "Representative Plaintiff" or "Lead Plaintiff") and all opt-in

and/or putative plaintiffs (collectively, "Plaintiffs"), on their own behalf and on behalf of the

collective classes and proposed Rule 23 classes identified below.  Plaintiffs and the Putative

Collective Members and Class Members were or are employed by Allied Universal Security

Services, Allied Barton Security Services, LLC and/or Allied Barton Security Holdings, LLC

(together, "Defendants") as non-exempt hourly Airport Security Agents ("ASAs"), Lead Airport

Security Agents ("LASAs") (together with ASAs, "Security Agents"), Operations Assistants,

and/or Supervisors at John F. Kennedy International Airport ("JFK").

2.      Defendants denied Plaintiffs and the Putative Collective and Class their minimum wage compensation, "gap time" compensation, and overtime compensation, and made unlawful deductions by separate transactions from Plaintiffs' wages in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* and New York Labor Law ("NYLL") § 650 *et seq.*  Defendants did this by, *inter alia*:

     i.     Requiring Security Agents, Operations Assistants and Supervisors to work "off-the-clock" before their scheduled shifts, during meal breaks, following the completion of their scheduled hours and while travelling between posts on JFK property;

     ii.     Failing to properly calculate their regular rate of pay;

     iii.     Failing to reimburse Plaintiffs for the cost of necessary business expenses; and

     iv.     Failing to provide Plaintiffs and the Putative Class with accurate wage statements in violation of New York Labor Law ("NYLL") §195(3).

3.      The Putative Collective and Class are similarly situated to the Plaintiffs under Federal Rule of Civil Procedure ("FRCP") 23 and § 216(b) of the FLSA and have suffered the same violations pursuant to Defendants' common policies and practices.

4.      The Collective is made of all persons who are or have been employed by Defendants as Security Agents, Operations Assistants or Supervisors at JFK at any time within the three years prior to this action's filing date through the date of the final disposition of this action (the "Collective Period") and who were subject to Defendants' unlawful policy of failing to pay minimum wage compensation for all hours worked, failing to pay overtime premiums for all hours worked over 40 in a given workweek, failing to properly calculate the regular rate of pay, and/or failing to keep accurate records of hours Plaintiffs actually worked.

5.      The Class is made up of all persons who are or have been employed by Defendants as Security Agents, Operations Assistants or Supervisors at JFK within the period of

six years prior to this action's filing date (the "Class Period") and who were subject to

Defendants' unlawful policy and/or practice of failing to pay Plaintiffs minimum wage, gap time

compensation, and/or overtime premiums for all hours worked over 40 in a given workweek,

failing to keep accurate records of hours Plaintiffs actually worked, subjecting Plaintiffs to a

practice of unlawful deduction by separate transaction for business-related expenses, and/or

failing to provide Plaintiffs with accurate wage statements reflecting all hours, including

overtime and gap time hours worked.

6.      Plaintiffs seek relief for the Collective under the FLSA and the Class pursuant to

the applicable provisions of the NYLL, to remedy the Defendants' failure to pay all wages due,

in addition to injunctive relief.

## PARTIES

7.      Individual and Representative Plaintiff Kirk Douglas is a former Security Guard

and Supervisor, and presently and at all relevant times residing in Brooklyn, New York.   He

began providing security services at JFK in 2012, when FJC Security Services ("FJC")

contracted with PANYNJ to provide such services at JFK.

8.      In or around September 2013, Allied Barton took over FJC's contract with the

PANYNJ.   Douglas continued to work at JFK as a Security Guard until summer of 2015, at

which time he became a Supervisor.  He was terminated from Allied Barton in 2016.  At all

relevant times, Plaintiff Douglas was an "employee" within the meaning of all relevant statutes.

9.      Defendants Allied Barton Security Services, LLC and Allied Security Holdings

LLC are Delaware corporations with offices in New York, New York.

10.     Defendant Allied Universal Security Services ("Allied Universal") is a Pennsylvania

corporation with offices at 229 West 36th Street, New York, NY 10018 and 199 Water

Street, New York, NY 10038.  Allied Universal was formed in or around August 2016 as the result of a merger between Allied Barton and Universal Services of America.  Allied Universal maintains that it is the largest security force in North America and employs over 140,000 individuals.

11.     Upon information and belief, Defendant Allied Universal is the parent of Allied Barton Security Services LLC and Allied Security Holdings LLC, both of which are wholly owned subsidiaries of Allied Universal.

12.     At all relevant times herein, Allied Universal, Allied Barton Security Services LLC and Allied Security Holdings LLC met the definition of an "employer" of Plaintiffs under all applicable statutes, including the FLSA and NYLL.

13.     The Lead Plaintiff and the putative Collective and Class were employed by all Defendants as a single employer.

14.     The Defendants controlled the work performed by Plaintiffs by setting corporate standards, setting employee policies and procedures and regulating employee behavior.

15.     Upon information and belief, throughout the merger and acquisitions process ongoing between approximately 2013 through 2016, all Defendants have maintained a substantial continuity of business operations.  Defendants utilize the same facilities, substantially the same work force, substantially the same supervisory personnel, the same machinery, equipment, and methods of production and provide the same service.

16.     At all relevant times, all the Defendants have met the definition of Plaintiffs' "employer" under Section 3(d) of the FLSA, 29 U.S.C. § 203(d) and NYLL §190(3).

17.     Upon information and belief, Defendants maintain control, oversight, and direction over their operations and employment practices, including commonly managed human resources, benefits, and labor functions.

18.     At all relevant times, the Defendants have operated together as a single common enterprise in conducting business, including the business practices described in this Complaint.

19.     Upon information and belief, the Defendants are interrelated companies that have common ownership, officers, managers, products, services, and corporate purpose.

20.     At all times hereinafter mentioned, Defendants employed employees, including Plaintiffs, who regularly engaged in commerce or in the production of goods for commerce or in handling, selling or otherwise working on goods and materials have moved in or produced for commerce within the meaning of Section 3(b), (g), (i) and (j) of the FLSA, 29 U.S.C. § 203(b), (g), (i), (j), (r) & (s).

21.     Defendants' gross volume of business is not less than $500,000 within the meaning of 29 U.S.C. § 203(s)(A)(ii).

## JURISDICTION & VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.  The Court also has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1332.

23.     In addition, the Court has jurisdiction over Plaintiffs' claims under the FLSA pursuant to 29 U.S.C. § 207 *et seq*.

24.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

25.     Venue is proper in the United States District Court, Southern District of New York pursuant to 28 U.S.C. § 1391, because the violations described herein occurred in this district.

26.     This Court has personal jurisdiction over Defendants because they caused injury within the state (upaid wages), routinely solicit and transact business in New York, and dervice substantial revenue from services rendered in New York State.

## WAGE AND HOUR COLLECTIVE
## AND CLASS ACTION FACTUAL ALLEGATIONS

27.     Defendants provide security services, janitorial services, and personnel services throughout the United States, including the New York metropolitan area.

28.     Since 2013, Defendants have provided security to facilities and property at JFK pursuant to a contract between and among Defendants and the PANYNJ.

29.     At all times relevant to this action, Defendants have directly employed approximately 300 Security Agents, Operations Assistants and Supervisors at JFK pursuant to Defendants' contract with the PANYNJ.

30.     Work rules required that Plaintiffs begin the workday by reporting to a central location at JFK, Building 14.

31.     At Building 14 Plaintiffs would receive their location assignments for the day.

32.     Defendants did not have an FLSA compliant timekeeping system, and instead required Plaintiffs and every member of the putative Collective and Class to sign in and out of a daily attendance log at the start and end of the shift, respectively.

33.     Plaintiffs could not enter the actual time that they started or finished their workday, nor were they allowed to record the hours that they were on meal or rest breaks.

34.     Instead, the Plaintiffs' standard shift hours were pre-printed on the sheet and could not be altered without management's approval.

35.     ASAs were assigned to stationary posts throughout the airport and tasked with various security responsibilities, such as checking airport and airline employee identification credentials, performing inspections on vehicles entering airport areas through secured gates, and guarding against trespassers.

36.     LASAs were assigned tasks such as patrolling perimeter fences around airport runways and tarmacs, and watching the monitors in JFK's remote camera control room.

37.     Operations Assistants reported to Supervisors and helped the Supervisors carry out their office-related functions.

38.     Supervisors would typically be assigned two to a shift and were responsible for overseeing the work of Operations Assistants and Security Agents.  As such, Supervisors' duties included driving, or riding as a passenger, from location to location on JFK property, and much of their time was spent outside of their offices.

39.     In order to reach their assigned location, Plaintiffs were required to drive, or be a passenger in, official security vehicles owned and/or operated by Defendants.  The time Plaintiffs spent driving in such official security vehicles was ***always*** considered "on duty," even if their shifts had ended.

40.     Security Agents, Operations Assistants, and Supervisors were all paid on an hourly basis.  Paid shifts would consist of eight (8) hours of regular time, and forty (40) total hours per week.

41.     Pursuant to Plaintiffs' union contract, Security Agents, Operations Assistants and Supervisors were supposed to be allotted one fifty (50) minute unpaid lunch break per shift.

42.     Plaintiffs' meal breaks were scheduled; that is, an employee would have to take his/her break at specified times during his/her shift.

43.     While Plaintiffs were to receive a fifty (50) minute unpaid meal break, they were in practice only allotted ten (10) to twenty (20) minutes of a bona fide meal break time during their shifts to take their meal break.

44.     Additionally, as set forth in further detail below, Plaintiffs also had other twenty (20) minutes of unpaid time that should have been allotted towards Plaintiffs' lunch breaks was instead used by Defendants for an unpaid pre-shift "roll call".

45.     Because most, if not all, of Plaintiffs' lunch break was unpaid, and the daily twenty (20) minute roll call was also unpaid, in order to complete an eight-hour shift, Security Agents had to be present for at least nine (9) hours and twenty (20) minutes each day.

46.     When Security Agents, Operations Assistants and Supervisors worked more than forty hours in a scheduled week, they were entitled to one and one-half time their regular hourly rate of pay for that additional time, as overtime pay.

**<u>Defendants' Unlawful "Off the Clock" Practice of Forcing Security Agents to Work Before Their Shifts</u>**

47.     Plaintiffs incorporate by reference all of the factual allegations made in the preceding paragraphs.

48.     All Security Agents were required to report for work twenty (20) minutes before the start of every shift for a "roll call" or attendance drill.

49.     At this time, Security Agents would sign in for the start of their shift, but were not permitted to sign in at the actual time they arrived for "roll call."

50.     Instead, Security Agents would sign in for the time their assigned shift was supposed to begin, on a pre-printed sheet and did not record the twenty (20) minutes of unpaid pre-shift time required for "roll call."

51.     Because Security Agents were required to arrive at least twenty (20) minutes early each work day, without compensation for such time, each and every full five-day workweek (all weeks besides those weeks where a Security Agent took a sick day or vacation day) they worked at least 1 hour and 40 minutes of unpaid overtime.

52.     Lead Plaintiff Douglas worked at least one (1) hour and forty (40) minutes of unpaid overtime, due to time spent arriving early for the pre-shift "roll call" approximately forty (40) weeks or more each year of his employment with Defendants as a Security Agent.

53.     By way of further example, Ms. LaDonna Powell is a former Security Guard and Supervisor with Defendants, who began her employment with nonparty FJC in or around 2012, and continued to work for pre-merger Allied Barton when that entity contracted with PANYNJ to provide security services for JFK.

54.     Ms. Powell worked as a Security Guard until June 2014, at which time she became a Supervisor.  She was terminated from her position with Allied Barton in early 2016.

55.     By way of example, Ms. Powell worked at least one (1) hour and forty (40) minutes of unpaid overtime, due to time spent arriving early for the pre-shift "roll call" approximately forty (40) weeks or more each year of her employment with Defendants as a Security Agent.

**Defendants' Unlawful "Off the Clock" Practice of Forcing Security Agents to Work During Unpaid Lunch Breaks**

56.     Plaintiffs incorporate by reference all of the factual allegations made in the preceding paragraphs.

57.     Defendants' work rules prohibited Security Agents, Operations Assistants and Supervisors from consuming food anywhere except designated areas on JFK property.

58.     An employee found consuming food at a post or inside a vehicle, for example, would be subject to disciplinary sanctions, and ultimately, termination.

59.     Security Agents, assigned to specific posts at JFK, would have to wait to take a meal break until a replacement showed up at their post to replace them.  The replacement would be driven in a vehicle belonging to Defendants to the post in question, and the Security Agent leaving for his/her lunch break would then ride in the vehicle that had brought his/her replacement to the designated place for taking meals.

60.     After getting picked up, the Security Agents would be driven from post to post to pick up other Security Agents and then travel to the designated meal area.

61.     If a Security Agent's replacement appeared late to the post, the Security Agent's lunch break would not be extended on the back end – that is, the Security Agent was on-duty, at his/her post, during his/her allotted unpaid lunch break and was nonetheless required to return to his/her post at the scheduled end time of the lunch break, despite not being relieved of their duties at the start of their lunch break.

62.     Because of JFK's vast geographic size, many employees were stationed far from their designated lunch area; thus, it would frequently take approximately twenty (20) minutes for Plaintiffs to reach the designated lunch area, including time spent on-duty at their posts waiting to be picked up.

63.     This process would be repeated on the way back to a Security Agent's post, taking another approximately twenty (20) minutes, leaving Plaintiffs only about 10 minutes to take a bona fide break.

64.     As detailed further below, the time spent in the Defendants' vehicle traveling to and from the lunch area was compensable time because Plaintiffs were not fully relieved of their security related duties during such travel time.

65.     By way of example only, time spent waiting for late replacements and traveling to and from the designated lunch area resulted in approximately three (3) hours and twenty (20) minutes of unpaid overtime for Plaintiff Douglas each and every full five-day workweek (all weeks besides those weeks where they took a sick day or vacation day) during his employment with Defendants as a Security Agent.

66.     Similarly, Ms. Powell worked approximately three (3) hours and twenty (20) minutes of unpaid overtime per week each and every full five-day workweek (all weeks besides those weeks where they took a sick day or vacation day) during her employment with Defendants as a Security Agent, due to waiting for replacements and traveling to and from the designated lunch area.

67.     Upon information and belief, all Security Agents experienced the same travel time and late relief issues that resulted in significant unpaid overtime hours each week.

68.     Furthermore, at least once per week, no relief would ever appear to allow a Security Agent to take their lunch break; however, Security Agents were not paid for these breaks that were missed entirely.

69.     By way of example only, Ms. Powell was not relieved for her lunch break approximately once a week for the entirety of her time as a Security Agent.

70.     Ms. Powell frequently complained that she had not been relieved and was therefore unable to take any lunch break whatsoever.

71.     Despite her complaints, her manager and supervisor would simply promise that she would get paid for the time – but Ms. Powell was not paid for all her missed lunch breaks.

72.     Additionally, pursuant to Defendants' work rules, while driving or riding in a vehicle controlled by Defendants, all employees were "on duty." Thus, they were required to be on the lookout for any security-related issues and in the event that they observed a security-related incident occurring while riding in or driving the vehicle, employees were required to take any and all necessary action.

73.     In addition, drivers were subject to Defendants' rules regarding the operation of the vehicle. If the employee driving the vehicle committed a traffic infraction and was ticketed by PANYNJ Police, or if the driver drove in a manner contrary to Defendants' rules regarding proper driving, that employee was subject to disciplinary action by Defendants, including termination.

74.     Further, if, while riding in a vehicle, an employee-passenger observed the vehicle's driver committing a traffic infraction or otherwise driving in a manner contrary to Defendants' rules regarding proper driving, the employee-passenger was duty-bound to report such infraction to a supervisors or management. If the employee-passenger failed to report the driver's infraction, that employee was herself subject to disciplinary action, up to and including termination.

75.     By way of example only, Plaintiff Douglas, as a former supervisor, is aware of specific situations which occurred during his employment in which ASAs, as employee-passengers, were disciplined for failing to report traffic infractions to management.

76.     By way of further example, on one occasion as an ASA, as Ms. Powell was on her way to lunch, she witnessed a vehicle accident on the tarmac. Ms. Powell was required to stop at

the accident, assist the driver and passengers, alert the proper authorities and compose a witness incident report.  This process took at least an hour, requiring Ms. Powell to work through her entire break.

77.     Nonetheless, Ms. Powell was not paid for that time.

78.     Security Agents did not receive any overtime pay for the additional time they spent "on-duty" during their lunch breaks while waiting for a replacement, driving in a vehicle to or from a lunch break, responding to a security incident, or monitoring driving infractions. During that time each week Plaintiffs were working without pay.

79.     Upon information and belief, all Plaintiffs were subject to the same policies and practices that resulted in significant unpaid overtime for working through their meal break.

80.     The SEIU would not file grievances on behalf of Security Agents who were forced to perform unpaid work during lunch breaks.

**Defendants' Unlawful "Off the Clock" Practice of Forcing Supervisors and Operations Assistants to Work During Unpaid Lunch Breaks**

81.     Plaintiffs incorporate by reference all of the factual allegations made in the preceding paragraphs.

82.     Supervisors and Operations Assistants were not permitted to take their fifty (50) minute lunch breaks.

83.     Supervisors were typically in the field to supervise the work of Security Agents, write incident reports, and send quality reports to upper management and corporate management.

84.      Further, during "meal break shifts," so-called meal break shift Supervisors were required to work through their lunch while driving between locations relieving ASAs and LASAs to allow them to take their break.

85.     Finally, regardless of whether they worked the "meal break shift" or not, Supervisors were frequently unable to take a meal break or afternoon break since they were driving between posts and, because of the substantial drive time, did not have time to take a break.

86.     Despite being deducted the full fifty (50) minutes from each shift for an unpaid meal break, Supervisors worked through their lunch nearly every day.

87.     By way of example, as a Supervisor, Ms. Powell was unable to take an uninterrupted meal break at least four (4) times per week, resulting in approximately three (3) hours and twenty (20) minutes of unpaid overtime each full five-day workweek.

88.     Ms. Powell was explicitly told on more than one occasion by her supervisor, Al Diaz, that Supervisors were not permitted to eat anywhere that someone could "see them," making it impossible to take a bona fide meal break.

89.     Furthermore, during her time as an Operations Assistant, Ms. Powell was not permitted to leave her desk for lunch and was required to answer phones at all times during her shift.

90.     Therefore, on the rare occasion during which she asked a Security Agent to pick her up something to eat, Ms. Powell was still unable to take a bona fide meal break because she was required to remain at her desk to be available to answer any phone call or request from upper management regarding the Supervisor that she was assisting, or face serious discipline.

91.     Upon information and belief, all Supervisors and Operations Assistants were subject to the same policies and practices that resulted in significant unpaid overtime for working through their meal break.

**Defendants' Unlawful, "Off-The-Clock" Post-Shift Practices for Security Agents at JFK**

92.     Plaintiffs incorporate by reference all of the factual allegations made in the preceding paragraphs.

93.     After clocking in, Security Agents drove or rode to their posts in vehicles owned/and or operated by Defendants, and either spent their shifts in those vehicles riding around JFK and/or at a designated posting.

94.     Rather than clock out at Building 14 – where they had clocked in – the Security Agents would sign out of their shifts at their posts, or in the vehicles to which they were assigned, at the exact end time of their scheduled shifts.

95.     Once they had signed out for the day, either at their post or in their vehicle, Security Agents were "off-the-clock" and not paid for any further time.

96.     Nonetheless, Defendants required Security Agents to continue working after their shift had ended between twenty (20) and forty-five (45) minutes per day at least three (3) days per week, resulting in a minimum of sixty (60) minutes of unpaid post-shift overtime per week per Security Agent.

97.     For example, despite signing out at their post, Security Agents were required to return to Building 14 at the ends of their shifts, in order to return the equipment and/or vehicles they had been provided that day.

98.     Because of the large geographic area of JFK, after being relieved it could often take a Security Agent up to 35 minutes to travel back to Building 14.

99.     While driving back to Building 14 after their shifts had ended, Security Agents were "on duty," in the same way they were during their travel time to the lunch area during their lunch breaks.

100.    Security Agents were obligated to fulfill identical duties as security guards and supervisory security guards while traveling back to Building 14 as they were expected to while standing at their posts.

101.    By way of example only, on at least two occasions as a Security Agent, Ms. Powell witnessed a vehicle accident and was required to stop, provide assistance and prepare an incident report, despite being "off-the-clock" after her shift had ended.

102.    This process takes approximately forty-five (45) minutes to complete.  However, Ms. Powell was not paid any wages for this post-shift off-the-clock work.

103.    In addition, and again, similar to their lunch breaks, at the end of their shifts Security Agents were required to stay at their posts until the Security Agent working the following shift arrived.

104.    If the Security Agent for the following shift arrived at her assigned post after the end of the prior shift, the Security Agent assigned to the prior shift would not be paid for either the additional time spent at the post, or the time spent traveling back to Building 14.

105.    By way of example, including late relief, Lead Plaintiff Douglas spent at least twenty (20) minutes and upwards of forty (40) minutes traveling back to Building 14 to drop off their vehicles each shift during the entirety of his employment with Defendants as a Security Agent, resulting in between one (1) hour and twenty (20) minutes and three (3) hours and twenty (20) minutes of unpaid overtime per week.

106.    Ms. Powell also worked between one (1) hour and twenty (20) minutes and three (3) hours and twenty (20) minutes of unpaid overtime per week for off-the-clock post-shift work as a Security Agent.

107.    Upon information and belief, all Security Agents were subject to the same policies and practices that resulted in significant unpaid post-shift overtime for late shift relief and travel time.

108.    The SEIU would not file grievances on behalf of Security Agents who were forced to perform the "off the clock" work after their shift.

**Defendants' Unlawful, "Off-The-Clock" Post-Shift Practices for Supervisors at JFK**

109.    Plaintiffs incorporate by reference all of the factual allegations made in the preceding paragraphs.

110.    The majority of a Supervisor's work during their shift was comprised of traveling around the airport to monitor performance and quality of the work of Security Agents and provide assistance if necessary.

111.    Therefore, Supervisors were rarely in their offices at the end of their shift and were frequently at least thirty (30) minutes away from their office at the end of their shifts.

112.    Nonetheless, Supervisors would technically "sign out" of their shift the moment that their shift was scheduled to end.

113.    While traveling back to the office, in uniform, Supervisors were required to perform identical duties as during their shift, despite being technically "off-the-clock."

114.    By way of example only, while Ms. Powell was employed as a Supervisor, she was frequently required to stop her vehicle on the way back to her office in order to compose an incident report, send it to corporate management for approval, and report back that the incident was properly recorded, despite being "off-the-clock."

115.     By way of example only, this occurred at least two times per week and took approximately one (1) hour and thirty (30) minutes.  Including travel time, on these occasions Ms. Powell worked approximately two (2) hours of unpaid overtime.

116.     Furthermore, Supervisors frequently had paperwork to complete upon returning to Building 14, requiring approximately forty-five (45) minutes of work several times per week after the end of their shifts.

117.     Finally, all Supervisors were required to attend a mandatory conference call, lasting approximately (3) hours, once a week on Tuesdays, regardless of whether the Supervisor was even scheduled for work that day.

118.     Supervisors, including Lead Plaintiff Douglas and Ms. Powell, were not paid for their time on this conference call, resulting in up to three (3) hours of unpaid overtime per week.

119.     Overall, on an average week, during their time as Supervisors, Lead Plaintiff Douglas and Ms. Powell, at minimum worked approximately ten (10) hours of overtime per week in post-shift work alone.

120.     Upon information and belief, all Supervisors were subject to the same policies and practices that resulted in such unpaid overtime for travel time and post-shift off-the-clock work.

**Defendants Have Knowledge Of The Widespread "Off-The-Clock" Practices at JFK**

121.     Defendants' knowledge of the widespread "off-the-clock" practices at JFK was well known at all times relevant to this action.

122.     Defendants had on-site Human Resources personnel at JFK.  In addition, the JFK operations were run by a Project Manager.

123.     During the relevant time period, Thomas Tarantola was the Project Manager.

124.     Plaintiffs repeatedly made both Human Resources personnel and Mr. Tarantola aware of Defendants' "off the books" practices with respect to both lunch breaks and the end of shifts, both orally and in writing.  However, those complaints went unheeded.

125.     In one incident, when a guard complained to management about not receiving overtime for meals and working at the post past the end of the shift, a management employee took a dollar bill out of his pocket and threw it at the guard in an act of hostility.

126.     The amount of overtime due to Plaintiffs can be verified by time records and other documents that were contemporaneously maintained by Defendants.

127.     Plaintiffs came to understand that the Defendants' refused to pay them the overtime to which they were legally entitled because Defendants' contract with the PANYNJ did not provide for reimbursement of overtime by the PANYNJ to Defendants.

128.     Supervisors were unable to control the compensation and scheduling practices dictated by Defendants.

129.     Supervisors often received complaints directly from Security Agents, but were not authorized to make any changes to a Security Agent's pay.

130.     By way of example, while Ms. Powell was employed by Defendants as a Security Agent, she frequently complained about working unpaid overtime before and after her shift, as well as being unable to take a bona fide lunch break.

131.     Supervisors would tell Ms. Powell that they would "look into it" and get her paid.

132.     However, Ms. Powell was never paid for this off-the-clock pre- and post-shift time nor was she paid for time worked during an unpaid meal time.

133.     In or around 2015, when Ms. Powell became a Supervisor, she came to realize that Supervisors were under direct orders by upper management not to compensate Security Agents for their off-the-clock work, even when they complained.

134.     By way of example only, Managers Martin Feeney, Francisco Oravallo, and Christopher Timberlake all reacted in a similar manner when Ms. Powell would attempt to get Security Agents paid for their off-the-clock time.

135.     On numerous occasions, Ms. Powell was told by Mr. Feeney, Mr. Oravallo, and/or Mr. Timberlake, "What are they [Security Agents] complaining about?  It's only 30 minutes!"  or, "It's only 45 minutes!"  On those occasions, Ms. Powell was instructed not to pay for the requested time.

136.     On numerous other occasions, Ms. Powell was told by Mr. Feeney, Mr. Oravallo, and/or Mr. Timberlake to simply "take [the requested time] out of their break."  In other words, to apply the off-the-clock work to an unpaid break in order to have the timesheets show that a break was taken.

137.     In actuality, of course, the Security Agents had not taken that break and were being forced to work unpaid overtime by the Defendants.

## FLSA COLLECTIVE ACTION ALLEGATIONS

138.     Plaintiffs incorporate by reference all of the factual allegations made in the preceding paragraphs.

139.     Defendants employed Plaintiffs during the Collective Period.

140.     Defendants classified Plaintiffs and Members of the Collective as nonexempt for the purposes of the FLSA, paying them an hourly wage rather than an annual salary.

141.    Upon information and belief, there are more than 300 current and former employees who are similarly situated to the Lead Plaintiff and who were similarly denied overtime compensation.

142.    Lead Plaintiff Douglas represents other employees, and is acting on behalf of Defendants' current and former employees' interests as well as his own interests in bringing this action.

143.    Defendants unlawfully required Lead Plaintiff Douglas and all individuals employed as Security Agents, Operations Assistants and Supervisors to work through their unpaid meal breaks.

144.    Defendants also unlawfully required Lead Plaintiff Douglas and all individuals employed as Security Agents to arrive early for work for a required roll call without compensation for such time.

145.    Further, Defendants unlawfully required Lead Plaintiff Douglas and all individuals employed as Security Agents, Operations Assistants and Supervisors to work past the end of their shifts without compensation.

146.    At all times during the Collective Period, Defendants, as a matter of common policy and/or practice, have not paid Lead Plaintiff Douglas and all individuals employed as Security Agents, Operations Assistants and Supervisors lawful overtime premiums for all hours worked in excess of 40 hours in a work week and/or minimum wage compensation for hours worked under 40 in a work week.

147.    Plaintiffs seek to proceed as a collective action, pursuant to 29 U.S.C. § 216(b), on behalf of themselves and the following class of persons:

**Proposed Collective:**  All individuals employed by Defendants as Security Agents, Operations Assistants and Supervisors at JFK and who, at any point during the Collective Period, earned but were not paid lawful FLSA overtime premiums for hours worked over 40 in a work week and/or the applicable federal statutory minimum wage for hours worked under 40 in a workweek during the Collective Period based on the practices alleged herein.

148. Specifically, Plaintiffs' Proposed Collective is further defined as involving (i) claims for unpaid overtime and minimum wage compensation for Defendants' practice of forcing Plaintiffs to work "off-the-clock" and without compensation during unpaid meal breaks; (ii) claims for unpaid overtime and minimum wage compensation for Defendants' practice of forcing Plaintiffs to work "off-the-clock" before the beginning and after the end of their shifts, which they knowingly suffered and permitted, and/or commonly enforced FLSA recordkeeping practice violations which resulted in unpaid wages.

149. As such, Lead Plaintiff Douglas and the Proposed Collective suffered damages for unpaid earned overtime wages under the FLSA in nearly all, if not all, the weeks they worked during the Collective Period.

150. Defendants were aware or should have been aware that the law required them to pay all non-exempt employees, including Lead Plaintiff Douglas and the Proposed Collective, an overtime premium of 1 and ½ times their regular rate of pay for all work-hours Defendants suffered or permitted them to work in excess of forty (40) per workweek.

151. Defendants' conduct, as set forth in this Complaint, was willful and in bad faith, and has caused significant damages to Lead Plaintiff Douglas and the Proposed Collective.

152. Defendants are liable under the FLSA for failing to properly compensate Lead Plaintiff Douglas and the Proposed Collective, and as such, notice should be sent to the Proposed Collective.

153.    There are numerous similarly situated current and former employees of
Defendants who were subject to the aforementioned policies in violation of the FLSA who would
benefit from the issuance of a Court supervised notice of the present lawsuit and the opportunity
to join in the present lawsuit.

154.    Those similarly situated employees are known to the Defendants and are readily
identifiable through Defendants' records.

## FEDERAL RULE OF CIVIL PROCEDURE
## RULE 23 NEW YORK CLASS ALLEGATIONS

155.    Plaintiffs incorporate by reference all of the factual allegations made in the
preceding paragraphs.

156.    Plaintiffs seek to proceed as a class action pursuant to Rule 23 of the Federal
Rules of Civil Procedure on behalf of the following defined classes:

**Proposed Class:**    All individuals employed by Defendants as Security Agents, Operations Assistants and Supervisors at JFK and who, at any point during the Class Period, who earned but were not paid lawful NYLL overtime premiums for hours worked over 40 in a work week and/or the New York minimum wage for hours worked under 40 in a workweek during the Collective Class Period based on the practices alleged herein.

157.    Specifically, Plaintiffs' Proposed Class is further defined as involving: (i) claims
for unpaid overtime and minimum wage compensation for Defendants'  practice of forcing
Plaintiffs to work "off-the-clock" and without overtime and/or "gap time" compensation both
during unpaid meal breaks, before the beginning of their shift and/or after the end of shifts which
they knowingly suffered and permitted, and/or commonly enforced NYLL recordkeeping
practice violations which resulted in unpaid wages; and (ii) claims for wage statement violations
for Defendants' failure to provide Plaintiffs' with accurate wage statements on each payday that

include the information required by NYLL §195(3), including the correct  number of hours worked during the pay period.

158.    Defendants have violated NYCRR 142-2.2 and NYLL §§ 191, 193 by failing to pay Lead Plaintiff Douglas and the Proposed Class at least one and one-half times the New York state minimum wage for all hours worked over 40 during the class period pursuant to the same illegal practices and policies alleged above.

159.    Numerosity:   The Proposed Class is so numerous that joinder of all members is impracticable.  Plaintiffs are informed and believe, and on that basis allege, that during the Class Period, Defendants employed over 300 people who satisfy the definition of the Proposed Class.

160.    Typicality:    Plaintiffs' claims are typical of those of the Proposed Class. Representative Plaintiff Douglas is informed and believes that, like other Security Agents, Operations Assistants and Supervisors, the Class Members were subjected to Defendants' policies, practices, programs, procedures, protocols and plans alleged herein concerning the failure to pay proper wages, failure to keep adequate records and failure to furnish accurate wage statements.

161.    Superiority:    A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

162.    Adequacy:    Representative Plaintiff Douglas will fairly and adequately protect the interests of the Proposed Class, and have retained counsel experienced in complex FLSA and NYLL class and collective action litigation.

163.    Lead Plaintiff Douglas's interests are co-extensive with those of the Proposed Class that they seek to represent.  They are willing and able to fairly represent the Proposed Class and to vigorously pursue their similar individual claims in this action.

164.    Commonality:  Common questions of law and fact exist to all members of the Proposed Class and predominate over any questions solely affecting individual members of the Proposed Class, including but not limited to:

a.    Whether Defendants unlawfully failed to pay lawful overtime premiums for all hours worked over forty (40) in a workweek for those violations stated above;

b.    Whether Defendants unlawfully failed to pay lawful "gap time" wages for all hours worked under forty (40) in a workweek for those violations stated above;Whether Defendants unlawfully failed to pay the state statutory minimum wage to members of the Proposed Class in violation of the NYLL;

c.    Whether those violations were pursuant to a common policy or practice applicable to all class members;

d.    Whether Defendants furnished class members with accurate wage statements on each payday containing the information required by NYLL § 195(3);

e.    Whether Defendants kept and maintained records with respect to each hour worked by Plaintiffs and the Proposed Class;

f.    Whether those violations were pursuant to a common policy or practice applicable to all class members;

g.    Whether Defendants employed Plaintiffs and the Proposed Class within the meaning of New York law;

h.    The proper measure of damages sustained by the Proposed Class; and

i.    Whether Defendants' actions were "willful."

165.    These common questions of law and fact arise from the same course of events, and each class member will make similar legal and factual arguments to prove liability.

166.    Further, adjudication of each individual member's claim as a separate action would be dispositive of the interest of other individuals not party to this action, impeding their ability to protect their interests.

167.    The case is maintainable as a class action under Fed. R. Civ. P. 23(b)(1) because prosecution of actions by or against individual members of the class would result in inconsistent or varying adjudications and create the risk of incompatible standards of conduct for Defendants.

168.    Further, adjudication of each individual member's claim as a separate action would be dispositive of the interest of other individuals not party to this action, impeding their ability to protect their interests.

169.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Proposed Class predominate over any questions affecting only individual members of the Proposed Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  Defendants' common and uniform policies and practices denied the Proposed Class the wages to which they are entitled.  The damages suffered by the individual Proposed Class members are small compared to the expense and burden of individual prosecution of this litigation.  In addition, class certification is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about Defendants' practices.

170.    Plaintiffs intend to send notice to all members of the Proposed Class to the extent required by Rule 23.  The names and addresses of the Proposed Class are available from Defendants.

171.    During the class period, and upon information and belief, Plaintiffs each worked more than 1 hour of gap time for which they were not paid the lawful straight time wage under

either the NYLL and more than 1 hour of overtime-eligible work during the class and collective

class periods for which they were not paid a lawful overtime premium of time and one half of

their regular rate of pay.

### AS AND FOR A FIRST CAUSE OF ACTION
**(Failure to Pay Overtime Compensation in Violation of the FLSA)**

172.    Plaintiffs allege and incorporate by reference the allegations in the preceding

paragraphs.

173.    Plaintiffs consent in writing to be a part of this action, pursuant to 20 U.S.C. §

216(b).  Plaintiffs' written consent forms are attached hereto.  Plaintiffs anticipate that as this

case proceeds, other individuals will sign consent forms and join as plaintiffs.

174.    At all relevant times, Defendants have been an "employer" engaged in interstate

commerce and/or in the production of goods for commerce, within the meaning of the FLSA, 29

U.S.C. § 203.  At all relevant times, Defendants have employed and/or continue to employ

employees, including Plaintiffs, and members of the Collective.

175.    At all relevant times, upon information and belief, Defendants have gross

operating revenues in excess of $500,000.00.

176.    The FLSA requires each covered employer to compensate all non-exempt

employees at a rate of not less than one and one-half times the regular rate of pay for work

performed in excess of forty hours per work week.

177.    During their employment with Defendants, within the applicable statute of

limitations, Plaintiffs and the other Collective members worked in excess of forty hours per

workweek without lawful overtime compensation.

178. Despite the hours worked by Plaintiffs and the Collective members, Defendants willfully, in bad faith, and in knowing violation of the FLSA, failed and refused to pay them overtime compensation.

179. Plaintiffs were not paid FLSA mandated overtime premiums uniformly and based on the policies and practices articulated above.

180. Also, by failing to accurately record, report, and/or preserve records of hours worked by Plaintiffs and the Collective, Defendants have failed to make, keep, and preserve records with respect to each of their employees sufficient to determine their wages, hours, and other conditions and practices of employment, in violation of the FLSA, 29 U.S.C. § 201, *et seq*.

181. Plaintiffs and all similarly situated employees are victims of uniform and employer-based compensation policies. Upon information and belief, these uniform policies, in violation of the FLSA, have been applied, and continue to be applied, to all Security Agents, Operations Assistants and/or Supervisors employed by Defendants in JFK.

182. Defendants have failed to make a good faith effort to comply with the FLSA with respect to its compensation to Plaintiffs and the Collective.

183. The foregoing conduct, as alleged, constitutes a willful violation of the FLSA, within the meaning of 29 U.S.C §§ 216(b) and 255(a).

184. Because Defendants' violations of the FLSA were willful, a 3-year statute of limitation applies, pursuant to 29 U.S.C. § 255.

185. Due to Defendants' FLSA violations, Plaintiffs and the members of the Collective are entitled to recover from Defendants damages in the amount of their respective unpaid overtime compensation, liquidated damages, attorneys' fees and costs, and interest.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Failure to Pay Minimum Wage Compensation in Violation of the FLSA)

186.    Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

187.    At all relevant times herein, Plaintiffs have been entitled to the rights, protections, and benefits provided under the FLSA, 29 U.S.C. §§ 201, *et seq.*

188.    The FLSA regulates, among other things, the payment of minimum wage by employers whose employees are engaged in interstate commerce, or engaged in the production of goods for commerce, or employed in an enterprise engaged in commerce or in the production of goods for commerce, per 29 U.S.C. §206(a); 29 U.S.C. § 207(a)(1).

189.    The Defendants are subject to the minimum wage requirements of the FLSA because they acted as an enterprise engaged in interstate commerce and its employees are engaged in commerce.

190.    Defendants, pursuant to their policy and practice, violated the FLSA by refusing and failing to pay Plaintiffs and other similarly situated employees a lawful minimum wage for all hours worked.

191.    Section 13 of the FLSA, codified at 29 U.S.C. § 213, exempts certain categories of employees from minimum wage obligations.  None of the FLSA exemptions apply to Plaintiffs or other similarly situated employees.

192.    Plaintiffs and all similarly situated employees are victims of uniform and employer-based compensation policies.  Upon information and belief, these uniform policies, in violation of the FLSA, have been applied, and continue to be applied, to all Security Agents, Operations Assistants and/or Supervisors employed by Defendants in JFK.

193.    Defendants have failed to make a good faith effort to comply with the FLSA with respect to its compensation to Plaintiffs and the Collective.

194.    The foregoing conduct, as alleged, constitutes a willful violation of the FLSA, within the meaning of 29 U.S.C §§ 216(b) and 255(a).

195.    Because Defendants' violations of the FLSA were willful, a 3-year statute of limitation applies, pursuant to 29 U.S.C. § 255.

196.    Due to Defendants' FLSA violations, Plaintiffs and the members of the Collective are entitled to recover from Defendants damages in the amount of their respective unpaid overtime compensation, liquidated damages, attorneys' fees and costs, and interest.

**AS AND FOR A THIRD CAUSE OF ACTION**
**(Failure to Pay Overtime Compensation in Violation of NYCRR § 142.2.2 and Article 19 of the NYLL)**

197.    Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

198.    At all relevant times, Plaintiffs were employees and the Defendants have been employers within the meaning of the NYLL.

199.    The overtime wage provisions of NYLL Article 19 and its supporting regulations apply to Defendants.

200.    Defendants have failed to pay Plaintiffs and the Proposed Class the overtime wages to which they were entitled under the New York Labor Law.

201.    By Defendants' failure to pay Plaintiffs and the Proposed Class Members premium overtime wages for hours worked in excess of 40 hours per week, they have willfully violated NYLL Article 19, §§ 650 *et seq.*, and the supporting New York State Department of Labor Regulations, including but not limited to the regulations in 12 N.Y.C.R.R. Part 142.

202.    Also, Defendants have violated NYCRR 142-2.2 and NYLL §§ 191 and 193 by failing to pay Plaintiffs and the Proposed Class at least one and one-half times the minimum wage for all hours worked over 40 in any workweek during the Class Period.

203.    Due to Defendants' violations of the NYLL, Plaintiffs and the Proposed Class are entitled to recover from Defendants all unpaid overtime wages, liquidated damages, reasonable attorneys' fees and costs of the action, and pre-judgment and post-judgment interest.

### AS AND FOR A FOURTH CAUSE OF ACTION
**(Failure to Pay Minimum Wages and "Gap Time" Wages in Violation of NYLL §§ 191, 193 and 652 and Article 19)**

204.    Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

205.    At all relevant times, Plaintiffs were employees and the Defendants have been employers within the meaning of the NYLL.

206.    The minimum wage provisions of NYLL Article 19 and its supporting regulations apply to Defendants.

207.    Defendants have failed to pay Plaintiffs and the Proposed Class the minimum wages to which they were entitled under the NYLL.

208.    By Defendants' failure to pay Plaintiffs and the Proposed Class Members minimum wages, they have willfully violated the NYLL Article 19, §§ 652 *et seq.*, and the supporting New York State Department of Labor Regulations.

209.    Due to Defendants' violations of the NYLL, Plaintiffs and the Proposed Class are entitled to recover from Defendants their unpaid minimum wages, liquidated damages, reasonable attorneys' fees and costs of the action, and pre-judgment and post-judgment interest.

210.    Similarly, Defendants have failed to pay Plaintiffs and the Proposed Class the difference between the New York State minimum wage and their hourly rate of pay as determined by Defendants for all hours worked in a workweek, a practice that is unlawful under the NYLL.

211.    Specifically, Defendants failure to pay these – known as "gap time" wages under the relevant precedent – is prohibited by NYLL Section 193 which expressly prohibits an employer from making unauthorized deductions from employees' wages.

212.    Due to Defendants' violations of the NYLL, Plaintiffs and the Proposed Class are entitled to recover from Defendants all unpaid overtime wages, liquidated damages, reasonable attorneys' fees and costs of the action, and pre-judgment and post-judgment interest.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Failure to Furnish Accurate Wage Statements in Violation of NYLL §195(3))

213.    Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

214.    At all relevant times, Plaintiffs were employees and the Defendants have been employers within the meaning of the NYLL.

215.    The recording keeping provisions of NYLL Article 19 and its supporting regulations apply to Defendants.

216.    Defendants did not provide Plaintiffs and members of the Rule 23 Class with a legally sufficient wage statement upon the payment of wages, as required by NYLL § 195(3).

217.    NYLL §195(3) requires that employers furnish employees with wage statements containing accurate, specifically enumerated criteria required under the NYLL.

218.    Due to Defendants' NYLL violations, Plaintiffs and Class members are entitled to statutory penalties of $100 for each workweek that Defendants failed to provide them with

accurate wage statements, or a total of $2,500.00, reasonable attorneys' fees, costs, and injunctive and declaratory relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs, on behalf of themselves and all members of the putative class and collective actions, prays for relief as follows:

A. That the Court determine that this action may proceed as a class action under Rule 23(b)(1) and (3) of the Federal Rules of Civil Procedure;

B. That Defendants are found to have violated the provisions of the New York Labor Law as to Plaintiffs and the Class;

C. That Defendants are found to have violated the Fair Labor Standards Act as to Plaintiffs and the Collective;

D. That Defendants' violations as described above are found to be willful;

E. An award to Plaintiffs and the Collective of damages against Defendants and in favor of Plaintiffs and the Collective, plus such pre-judgment and post-judgment interest as may be allowed by law;

F. An award to Plaintiffs and the Collective an additional equal amount as liquidated damages;

G. An award to Plaintiffs and the Class of damages against Defendants and in favor of Plaintiffs and the Class, plus such pre-judgment and post-judgment interest as may be allowed by law;

H. An award Plaintiffs and the Class an additional equal amount as liquidated damages;

I.      That Defendants further be enjoined to cease and desist from unlawful activities in violation of the FLSA and NYLL;

J.      That Plaintiffs' counsel and Plaintiff Kirk Douglas can adequately represent the interests of the class as class counsel and class representative, respectively.

K.      An award of reasonable attorneys' fees and costs pursuant to the FLSA, NYLL and/or other applicable law; and

L.      For such other and further relief, in law or equity, as this Court may deem appropriate and just.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury as to all issues so triable.

DATED:  October 18, 2017

_____

Christopher Q. Davis, Esq.
Rita Lenane, Esq.
James Keneally, Esq. (of counsel)

The Law Office of Christopher Q. Davis
225 Broadway, Suite 1803
New York, New York 10007
646-430-7930 (main)
646-349-2504 (fax)
*Counsel for Plaintiffs and the putative class*