**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KIRK DOUGLAS, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>        vs.<br><br>ALLIED UNIVERSAL SECURITY SERVICES<br>ALLIED BARTON SECURITY SERVICES LLC<br>and ALLIED SECURITY HOLDING LLC,<br><br>        Defendants. | Case No.: 1:17-cv-6093-SJB |

<u>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION
FOR FINAL APPROVAL OF THE CLASS ACTION SETTLEMENT AND APPROVAL
OF THE FLSA SETTLEMENT**</u>

TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................................1

I.  LITIGATION HISTORY ...........................................................................................2

    A.  Factual and Procedural History ...........................................................................2

    B.  Overview of Investigation and Discovery ...........................................................3

    C.  Damages Calculations .........................................................................................5

        i.      Assumptions Used to Measure Class-Wide Damages.............................6

                1.  Assumptions of Unpaid Time For Airport Security Agents ("ASA") ..............7

                2.  Assumptions of Unpaid Time For Tour Supervisors ("TS")...........................8

                3.  Assumptions of Unpaid Time For Operations Assistants ("OA") ...................9

        ii.     Defendants Contest Plaintiff's Assumptions..........................................10

    D.  Settlement Negotiations......................................................................................10

    D.  The Plaintiffs' Unopposed Motion for Preliminary Approval ...........................12

    E.  Summary of the Notice and Claims Administration Process ..............................13

II.  OVERVIEW OF THE SETTLEMENT TERMS .....................................................16

    A.  The Settlement Fund ...........................................................................................16

    B.  Releases ..............................................................................................................16

    C.  Allocation Formula.............................................................................................17

    D.  Attorneys' Fees and Litigation Costs .................................................................18

    E.  Service Payments................................................................................................18

III. PLAINTIFFS SUBMIT THAT THE RULE 23 SETTLEMENT CLASS MEETS THE
     LEGAL STANDARD FOR CLASS CERTIFICATION.........................................19

    A.  Numerosity ..........................................................................................................20

    B.  Commonality .......................................................................................................21

C. Typicality .......................................................................................................22

D. Adequacy of the Named Plaintiffs and Class Counsel ................................23

E. Certification is Proper Under Rule 23(b)(3) ...............................................24

    1. *Common Questions Predominate* ..........................................................25

    2. *A Class Action is a Superior Mechanis*m ...............................................26

IV. FINAL APPROVAL IS APPROPRIATE PURSUANT TO RULE 23(e) BECAUSE THE
SETTLEMENT IS FAIR, ADEQUATE, AND REASONABLE...........................................26

A. The Proposed Settement is Procedurally Fair..............................................27

B. The Proposed Settlement is Substantively Fair ...........................................28

    1. *Litigation Through Trial Would be Complex, Costly, and Long*
    *(Grinnell Factor 1)* ....................................................................................28

    2. *The Reaction of the Class Has Been Positive (Grinnell Factor 2)* ...........29

    3. *Discovery Has Advanced Far Enough to Allow the Parties to Resolve the Case*
    *Responsibly (Grinnell Factor 3)* ...............................................................33

    4. *Plaintiffs Would Face Real Risks if the Case Proceeded*
    *(Grinnell Factors 4 and 5)* .......................................................................34

    5. *Establishing a Class and Maintaining it Through Trial Would Not Be Simple*
    *(Grinnell Factor 6)* ....................................................................................37

    6. *Defendant's Ability to Withstand a Greater Judgment is Not Clear*
    *(Grinnell Factor 7)* ....................................................................................39

    7. *The Settlement Funds are Substantial, Even in Light of the Best Possible Recovery*
    *and the Attendant Risks of Litigation (Grinnell Factors 8 and 9)* ................39

V. THE COURT SHOULD APPROVE THE FLSA SETTLEMENT .........................................40

CONCLUSION .......................................................................................................42

TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

*Acevedo v. WorkFit Medical LLC*,
No. 14-cv-6221, 2014 WL 4659366, at *12 (W.D.N.Y. Sept. 17, 2014) ...................................38

*Amchem Products, Inc. v. Windsor*,
521 U.S. 591, 623 (1997) ...........................................................................................25, 26

*Anderson v. Mt. Clemens Pottery Co.*,
328 U.S. 680, 687 (1946) ...................................................................................................36

*In re Austrian & German Bank Holocaust Litig.*,
80 F. Supp. 2d 164, 174 (S.D.N.Y. 2000), *aff'd sub. nom. D'Amato*, 236 F.3d 78 ..............passim

*Castillo v. Perfume Worldwide Inc.*,
17-cv-2972, 2018 WL 1581975, at *7 (E.D.N.Y. 2018) ...........................................................36

*Cheeks v. Freeport Pancake House, Inc.*,
796 F.3d 199, 206 (2d Cir. 2015) ....................................................................................passim

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974) ...........................................................................................passim

*Cody v. Hillard*,
88 F. Supp. 2d 1049, 1059-60 (D. S.D. 2000) .....................................................................2

*Consol. Rail Corp. v. Town of Hyde Park*,
47 F.3d 473, 483 (2d Cir. 1995) ........................................................................................38

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
502 F.3d 91, 108 (2d Cir. 2007) .........................................................................................25

*In re Currency Conversion Fee Antitrust Litigation*,
263 F.R.D. 110, 125 (S.D.N.Y., 2009) ..............................................................................32

*Damassia v. Duane Reade*,
250 F.R.D. 152, 164 (S.D.N.Y. 2008) ................................................................................26

*Damassia v. Duane Reade, Inc.*,
04 Civ. 8819, No. 06 Civ. 2295, 2009 WL 5841128, at *4 (S.D.N.Y. July 27, 2009) ...............19

*D'Amato v. Deutsche Bank*,
236 F.3d 78, 85 (2d Cir. 2001) ......................................................................................27, 29

*Desilva v. N. Shore Long Island Jewish Health Sys., Inc.*,
27 F.Supp.3d 313, 321 (E.D.N.Y.2014) ................................................................38

*Diaz v. Eastern Locating Service Inc.*,
10-cv-4082, 2010 WL 2945556, at *2 (S.D.N.Y. July 22, 2010) ................................24

*Doo Nam Yang v. ACBL Corp.*,
427 F. Supp. 2d 327, 339 n. 17 (S.D.N.Y. 2005) ....................................................37

*In re Dun & Bradstreet Credit Servs. Customer Litig.*,
130 F.R.D. 366, 372 (S.D. Ohio 1990) ...................................................................2

*Dziennik v. Sealift, Inc.*,
05 Civ. 4659, 2007 WL 1580080, at *6 (E.D.N.Y. May 29, 2007) ............................24

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
05 Civ. 10240, 2007 WL 2230177, at *4  (S.D.N.Y. July 27, 2007) ..........................27

*Frank v. Eastman Kodak Co.*,
228 F.R.D. 174, 182 (W.D.N.Y. 2005) .............................................................passim

*Gen. Tel. Co. of Southwest v. Falcon*,
457 U.S. 147, 157 n.13 (1982) ...............................................................................21

*Globe Surgical Supply v. GEICO Ins. Co.*,
59 A.D.3d 129, 137-38 (2008) ...............................................................................20

*Gortat v. Capala Bros., Inc.*,
07-cv-3629-ILG-SMG, 2012 WL 1116495, at *3 (E.D.N.Y. April 2, 2017) ..............21

*Grant v. Bethlehem Steel Corp.*,
823 F.2d 20, 23 (2d Cir. 1987) ..............................................................................30

*Green v. Wolf Corp.*,
406 F.2d 291, 301 (2d Cir. 1968) ...........................................................................26

*Hernandez v. Immortal Rise, Inc.*,
306 F.R.D. 91, 100 (E.D.N.Y. 2015) ......................................................................30

*Joel A. v. Giuliani*,
218 F.3d 132, 138-39 (2d Cir. 2000) ......................................................................40

*Khait v. Whirlpool Corp.*,
06 Civ. 6381, 2010 WL 2025106, at *5 (E.D.N.Y. Jan. 20, 2010) ...........................27

iv

*Kosakow v. New Rochelle Radiology Associates, P.C.*,
274 F.3d 706, 718 (2d Cir. 2001) ........................................................36

*Koss v. Wackenhut Corp.*,
03 CIV. 7679 (SCR), 2009 WL 928087, *3 (S.D.N.Y. Mar. 30, 2009) ......................20

*Laroque v. Domino's Pizza, LLC*,
557 F.Supp.2d 346, 352 (E.D.N.Y. 2008) .................................................38

*Lassen v. Hoyt Livery Inc.*,
3:13-cv-1529, 2014 WL 4638860, at *9 (D. Ct., Sep. 17, 2014) ...........................22

*Le v. SITA Info. Networking Computing USA, Inc.*,
2008 WL 724155, at *1 (E.D.N.Y. Mar. 13, 2008) .......................................41

*Lynn's Food Stores, Inc. v. U.S.*,
679 F.2d 1350, 1353 (11th Cir. 1982) ...................................................41

*Marisol A. v. Giuliani*,
126 F.3d 372, 376 (2nd Cir. 1997) ......................................................22

*Marriott v. County of Montgomery*,
227 F.R.D. 159, 173 (N.D.N.Y. 2005) ...................................................25

*Martens v. Smith Barney, Inc.*,
181 F.R.D. 243, 265 (S.D.N.Y. 1998) ...................................................32

*McKenna v. Champion Intern. Corp.*,
747 F.2d 1211, 1213 (8th Cir.1984) ....................................................40

*Naylor v. Securiguard, Inc.*,
801 F.3d 501, 506-508 (5th Cir. 2015) ..................................................36

*Newman v. Stein*,
464 F.2d 689, 693 (2d Cir. 1972) ......................................................39

*Nicholson v. Williams*,
205 F.R.D. 92, 98 (E.D.N.Y.2001) .....................................................21

*Odom v. Hazen Transp., Inc.*,
275 F.R.D. 400, 407 (W.D.N.Y. 2011) ..................................................21

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815, 846-48 (1999) ..........................................................25

*In re Penthouse Executive Club Compensation Litig.*,
2014 WL 185628, at *7 (S.D.N.Y. Jan. 14, 2014) ....................................................41

*Perez v. Allstate Ins. Co.*,
No. 11-cv-1812 (JFB), 2014 WL 4635745, at *3 (E.D.N.Y. Sept., 16, 2014) ...........................23

*Perkins v. Bronx Lebanon Hosp. Ctr.*,
Case No. 14 Civ. 1681, 2016 WL 6462117, at *4 (S.D.N.Y. Oct. 31, 2016), *report and
recommendation adopted*, 715 F. App'x 103, 104 (2018) ........................................35

*Port Auth. Police Benev. Ass'n, Inc. v. Port Auth. of N.Y. & N.J.*,
698 F.2d 150, 153-54 (2d Cir. 1983) ....................................................21, 22

*Reyes v. Altamarea Grp., LLC*,
No. 10 Civ 6451, 2011 WL 4599822, at *3 (S.D.N.Y. Aug. 16, 2011) ...........................40, 41

*Robidoux v. Celani*,
987 F.2d 931, 936-37 (2d Cir. 1993) ....................................................20, 21, 23

*Spicer v. Pier Sixty, LLC*,
269 F.R.D. 321, 337-338 (S.D.N.Y 2010) ....................................................24

*Thomas v. Albright*,
139 F.3d 227, 234 (D.C.Cir.1998) ....................................................32

*Torres v. Gristede's Corp.*,
No. 04 Civ. 3316, 2006 WL 2819730, at *16 (S.D.N.Y. Sept. 29, 2006) ..............................25

*Toure v. Central Parking Systems of New York*,
05-cv-5237, 2007 WL 2872455, at *7 (S.D.N.Y. 2007) ..........................................24

*U.S. v. City of New York*,
2015 WL 1063403, at *14 (E.D.N.Y. 2015) ....................................................30

*Vaccaro v. New Source Energy Partners L.P.*,
15-cv-8954, 2017 WL 6398636, at *5 (S.D.N.Y. Dec. 14, 2017) ...............................32

*In re Visa Check/MasterMoney Antitrust Litig*,
280 F.3d 124, 139 (2d Cir. 2001) ....................................................25

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
396 F.3d 96, 116 (2d Cir.  2005) ....................................................27, 28

*In re Warfarin Sodium Antitrust Litig*,
391 F.3d 516, 537 (3d Cir. 2004) ....................................................33

*Wolinsky v. Scholastic, Inc.*,
900 F. Supp. 2d 332, 335 (S.D.N.Y. 2012) ................................................................41

O̲T̲HER A̲U̲THORITIES

2 McLaughlin on Class Actions § 6:24 (8th ed.) ........................................................30

29 C.F.R. § 785.11...........................................................................................................36

DOL Opinion Letter, Fair Labor Standards Act, 2006 WL 4512943, at *1 (DOL Wage-Hour
Jan.17, 2006) ....................................................................................................................35

Federal Rule of Civil Procedure 23 ...............................................................................passim

Fair Labor Standards Act, 29 U.S.C § 216(b) ..............................................................38

## PRELIMINARY STATEMENT

Plaintiff Kirk Douglas (the "Named Plaintiff" or "Lead Plaintiff") respectfully requests, on behalf of the Claimants and Opt-in Claimants (collectively, the "Plaintiffs"), that this Court grant final approval of the settlement set forth in the amended Settlement Agreement and Release (the "Settlement" or "Settlement Agreement"), for which the Court already granted preliminary approval in an Order entered on October 10, 2019. *See* Docket Entry ("DE") 55. Specifically, the Plaintiffs, without opposition from Defendants Universal Protection Service, LLC[1] d/b/a Allied Universal Security Services, AlliedBarton Security Services LLC, and/or Allied Security Holdings LLC (together "Allied" or "Defendants"), respectfully request that the Court enter the proposed Order and Judgment granting final approval of the settlement, attached as Exhibit A to the Notice of Motion. (Class Counsel's request for an award of costs and fees is separately submitted, and Allied does not oppose that request.)

On October 10, 2019, the Court entered an order granting preliminary approval of the proposed class and collective action Settlement in this case, provisionally certified the class, appointed Christopher Q. Davis as Class Counsel, and approved a revised Notice of Proposed Settlement of Class Action and Collective Action Lawsuit and Fairness Hearing ("Notice"). *See* DE 55. Since that time, Class Counsel and Defendants' Counsel worked with the designated claims administrator, RG/2 Claims Administration ("RG/2" or the "Claims Administrator"), to issue the court-approved Notice to the 721 identified Class Members. *See* Davis Decl. ¶¶ 114-121. The Class Members were mailed a Notice and were provided the opportunity to exclude themselves by submitting an Opt-out Statement, or if they choose to participate they were provided an opportunity to inform this Court that they had an issue with the Settlement by filing an objection. *Id*. Similarly,

---

[1]     Universal Protection Services, LLC is the correct corporate name for the entity doing business as Allied Universal Security Services, which Plaintiff named in the Complaint.

the 595 FLSA Collective Members were also provided the opportunity to participate in the portion of the Settlement representing their FLSA claims by submitting a Consent to Join Form.[2] *Id.*

As set forth in greater detail below, the response to the Notice was very positive – as of today, March 13, 2020, only one (1) class member opted out of the Settlement and only one (1) Class Member has objected to the Settlement.[3] *See In re Dun & Bradstreet Credit Servs. Customer Litig.,* 130 F.R.D. 366, 372 (S.D. Ohio 1990) (approving the relevant settlement and affording "substantial weight" to the fact that fewer than 5% of the class members elected to opt out of the settlement); *see also Cody v. Hillard*, 88 F. Supp. 2d 1049, 1059-60 (D. S.D. 2000) (approving the relevant settlement in large part because only a small percent of the class had objected to the settlement). Additionally, this settlement satisfies all of the pertinent criteria for final approval under *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) and *Cheeks v. Freeport Pancake House, Inc.* 796 F.3d 199, 206 (2d Cir. 2015).

For these reasons, Class Counsel, on behalf of the Claimants and Opt-in Claimants, and without objection from Defendants, respectfully request that the Court grant the instant motion.[4]

## I.     LITIGATION HISTORY.

### A.     Factual and Procedural History.

On October 18, 2017, Named Plaintiff Kirk Douglas on behalf of himself and others similarly situated filed a Class and Collective Action (the "Complaint") by and through Class

---

[2]     As noted in the Settlement Agreement, all FLSA Collective Members are also Class Members; however, not all Class Members are also Collective Members.

[3]     The one (1) Class Member who filed an objection did not comply with the procedures described in the notice for submitting written comments objecting to the settlement or appearing at the fairness hearing, and thus should not be entitled to be heard at the hearing, to contest or appeal any approval of the settlement or any award of attorneys' fees or expenses, or to contest or appeal from any other orders or judgments of the Court entered in connection with the settlement. Nonetheless, Plaintiffs' substantive response to the objection is set forth in Section IV(B)(2) herein.

[4]     All defined terms contained herein shall have the same meanings as set forth in the Amended Settlement Agreement executed by the Parties and filed with this Court. *See* DE 53-1.

Counsel, The Law Office of Christopher Q. Davis, PLLC, alleging that Allied purportedly violated the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL") by regularly expecting or requiring the Named Plaintiff and other similarly situated current and former Airport Security Agents ("ASAs"), Operations Assistants ("OAs") and/or Tour Supervisors ("TSs", collectively with ASAs and OAs, the "Class") employed by one or more Defendants at JFK International Airport ("JFK") during the pertinent limitations period(s) to perform work "off-the-clock," primarily by performing uncompensated post-shift activities, including driving back to the base location before clocking-out, and performing compensable work during unpaid meal breaks. *See* Davis Decl. ¶ 3; *see also* DE 1. The Named Plaintiff also alleged that Defendants violated the NYLL by failing to provide Plaintiffs with accurate wage statements. *Id*. The Complaint sought recovery of unpaid wages, NYLL statutory penalties and attorneys' fees and costs, interest, and liquidated damages. *Id.* at ¶ 4. On January 22, 2018, Allied filed its Answer to the Complaint and denied the Named Plaintiff's claims and any entitlement to relief. *Id.* at ¶ 11; *see also* DE 12.

The Parties conducted two mediations before David Geronemus, Esq., an experienced class and collective actions mediator. *Id.* at ¶¶ 68, 73. In anticipation of the first mediation, the Parties agreed to the scope of mediation-related discovery set forth below.

**B.      Overview of Investigation and Discovery.**

After being retained by the Named Plaintiff, Class Counsel conducted a thorough investigation into the merits of the potential claims and defenses for the ASAs, OAs and TSs. *Id.* at ¶¶ 3-59. Notably, the Named Plaintiff held each of these three positions during his employment with Allied. *Id.* at ¶ 7. Class Counsel focused their investigation and legal research on the underlying merits of the Named Plaintiff's claims, the damages to which he and the putative Class and Collective were entitled, and the propriety of proceeding on a class and/or collective basis. *Id*.

at ¶¶ 3-59. Prior to filing the Complaint, Class Counsel conducted multiple in-depth interviews with the Named Plaintiff and another member of the class – LaDonna Powell – to determine the hours that they worked, wages they were paid, their compensation structure, the nature of their duties and responsibilities, and other information relevant to their claims. *Id*. at ¶¶ 6-9.

Class Counsel also reviewed thousands of pages of documents produced by Defendants, relevant to the entire Class, including but not limited to: (1) ESI search terms and custodians; and (2) the production of payroll data, timesheets, and daily post assignments. *Id.* at ¶ 17. Defendants also propounded interrogatories on the Named Plaintiff, which he responded to under oath. *Id.* at ¶¶ 16, 98. Based on the information provided by the Named Plaintiff and other non-party witnesses, and the review of Defendants' document production, Class Counsel was able to assess the litigation risks related to proceeding as a class and/or collective action. *Id*. at ¶ 23.

In preparation for the initial mediation, Class Counsel reviewed and analyzed the large amounts of time and payroll data, provided by Defendants, and analyzed thousands of pages of email correspondence, policy documents, training materials, and other documents received from Defendants. *Id.* at ¶¶ 15-22. In addition, Class Counsel also continued to conduct factual investigations of the claims through numerous detailed interviews of the Named Plaintiff and non-party witnesses and the drafting and execution of a sworn declaration from Named Plaintiff about his experiences as an ASA, OA and TS during the relevant class period. *Id.* at ¶¶ 24-55. Class Counsel also conducted extensive legal research on matters such as class certification/decertification standards and risk, factually similar cases, summary judgment risks, risks attendant to off-the-clock litigation, Defendants' anticipated defenses, and the Named Plaintiff's and the Class's damages. *Id.* at ¶ 23.

During the investigation, Class Counsel was able to determine that the claims for the OA

Class were not as strong as the ASA and TS Class(es). *Id.* at ¶ 56. Specifically, the OA's Claims, which predominately involved working through a lunch break, was refuted because the OA's lunch breaks were paid and OAs were only scheduled for 8-hour days, not 8.5-hour days. *Id.* at ¶ 57. Thus, despite performing work during their lunch breaks, the OAs were compensated for such time. *Id.* Similarly, the lunch claims for the TS's were also refuted because the TS's lunches were also paid, and the TS's were also only scheduled for 8-hour days. *Id.* at ¶ 58.

As such, the claims for OAs and TSs were limited to any post-shift time worked off-the-clock. *Id.* at ¶ 59. According to the Named Plaintiff and other non-party witnesses, the TS's worked significant post-shift off-the-clock time; however, the OA's post-shift off-the-clock hours were very infrequent and if they did stay late, it was generally *de minimis*. *Id*.

### C.   Damages Calculations.

The proposed settlement is substantial and well within the range of reasonableness when compared to the various possibilities of recovery. The Named Plaintiff calculated the maximum possible underpayment for each class – ASAs, TSs, and OAs – by and through a damage's expert retained by Class Counsel (the "Expert"). *Id.* at ¶¶ 64-66; *see also* Exs. 5-9.

To calculate damages, Class Counsel provided the Expert with (1) assumptions regarding off-the-clock time worked for ASAs, TSs and OAs; and (2) an excel database (referred to herein as the "Shift Database") that contained 354,971 lines of relevant data points necessary for computing such unpaid wages.[5] *Id.* The Shift Database enabled the Expert to isolate each day a class member worked as either an ASA, TS or OA and apply the assumptions as to the amount of off-the-clock time worked, as described below, to each such isolated day worked and then calculate

---

[5]      The Shift Database included the following data for every day worked by every putative Class Member: (1) Employee Number; (2) Job Description; (3) Employee Title; (4) Post Description; (5) Billing Tier; (6) Pay Type; (7) In Time; (8) Out Time; (9) Total Hours; (10) Hours Straight; (11) Hours Overtime; (12) Hours Doubletime; (13) Pay Rate; (14) Check Date; (15) Check Amount; (16) Check Total Wages; (17) Check Total Compensations; (18) Check Total Deductions; and (19) Check Total Taxes. *See* Ex. 2, Sample of Lines from Shift Database.

their underpayment accordingly. *Id.*

        i.        *Assumptions Used to Measure Class-Wide Damages.*

Class Counsel, with the assistance of the Expert, conducted a detailed examination of the Shift Database to best understand the usefulness of each of the data points in calculating damages. The review of the Shift Database revealed that the "Post Description" provided an accurate indication of an ASA's guard post assignment each day and was the most accurate indicator of whether someone was working as an ASA, OA, or TS on any given day. *Id.* at ¶ 21. For example, if someone was working as a TS the "Post Description" would say "Tour Supervisor 1" or "Tour Supervisor 2", indicating not only that they worked as a TS but also the Zone they worked in. *See e.g.* Ex. 2 at Line 5 and 18. This was more accurate than the "Job Description" or "Employee Title" because, for example, an ASA may, from time to time, fill in as an OA or TS. *Id.* at Line 17.

Then, Class Counsel with the assistance of the Named Plaintiff and non-party witnesses, formulated educated assumptions as to the amount of off-the-clock work performed by each of the Classes. These assumptions were based on interviews with the Named Plaintiff as to the nature of his work as an ASA, OA and TS, documentary evidence produced, and non-party witness interviews. *See* Davis Decl. ¶¶ 3-66. For the mediation, the Named Plaintiff, with the assistance of counsel, drafted an affidavit, which he signed under penalty of perjury, that provided detailed testimony regarding the off-the-clock work he claims he performed and reasonable inferences as to the time spent performing such work. *Id.* at ¶¶ 26-27. In addition, Class Counsel interviewed two non-party witnesses, both of whom worked for Defendants as ASAs during the Class Period. *Id.* at ¶¶ 28-55. One of the non-party witnesses interviewed by Class Counsel also worked as an OA and a TS during the Class Period. *Id.* at ¶ 30. Finally, Class Counsel reviewed thousands of pages of documentary evidence, including but not limited to: (i) over 20 banker's boxes containing every paper sign-in/sign-out sheet used by Defendants to record time worked for ASAs, OAs and

TSs during the Class Period; (ii) email correspondence regarding overtime; and (iii) handbooks and policy documents with information about reporting to post assignments. *Id.*¶¶ 17-22.

Based on all of this information, Class Counsel worked with the Expert to construct a damages model that utilized the below assumptions to calculate the unpaid time at either an overtime rate or straight time rate, where applicable. *Id.* at ¶¶ 60-66.

### 1. Assumptions of Unpaid Time For Airport Security Agents ("ASA"):

The Named Plaintiff alleged that ASAs suffered two categories of damages: (i) off-the-clock time spent driving from their post back to Defendants' office in Building 14 after their shift ended; and (ii) off-the-clock time spent driving to or from their post and Building 14 during the 30-minute unpaid portion of their 50-minute lunch period. Thus, the assumptions as to an ASAs unpaid time depended on the proximity of the posts to Building 14.

The Named Plaintiff reviewed the Shift Database, which revealed approximately 600 unique Post Descriptions applicable to the ASAs (the "Guard Posts") and grouped each unique Guard Post based on its distance from Building 14. *See* Ex. 3, Post Descriptions.[6]  Plaintiff knew the locations of most, if not all, of the Guard Posts based on his nearly 8 years working at JFK in security. *See* Ex. 4, Affidavit of Kirk Douglas ("Douglas Aff.") at ¶ 18. Based on the Named Plaintiff's knowledge of the Guard Posts, Class Counsel, with the Named Plaintiff's assistance, created a map of the JFK grounds that was divided into four (4) color coded zones. *Id.* at ¶¶ 20-27; *see also* Davis Decl. ¶ 60.[7]  Each zone then corresponded with distance-based categories for the Guard Posts, with non-remote being closest to the epicenter (*i.e.* Building 14) and remote being the furthest away. *Id.* Based on the 4 zones, Plaintiff was able to indicate, based on his personal

---

[6]      Plaintiff has redacted the names of the posts for security purposes.

[7]      During the mediation, counsel for Defendants had the opportunity to review this map and strongly disagreed with many of its classifications and assumptions.

knowledge, which zone each of the approximately 600 unique Guard Posts fell within. *Id.*

Based on all of this information, Class Counsel, with the Named Plaintiff's assistance, developed educated assumptions as to the amount of off-the-clock time worked by ASAs. Davis Decl. ¶ 63. When constructing the damages model, the Expert allocated an amount of unpaid time to an ASA each day based exclusively on the Guard Post they were assigned to that day. Specifically, the estimates for each of the categories are as follows:

1. *Non-Remote Posts* – no damages.
2. *Nearby Posts* - 10 minutes of unpaid post-shift drive time and no damages for lunch breaks.
3. *Semi-Remote Posts* – 20 minutes of unpaid post-shift drive time and 30 minutes of unpaid time during lunch breaks.
4. *Remote Posts* – 30 minutes of unpaid post-shift drive time and 30 minutes of unpaid time during lunch breaks.

*Id.* at ¶ 63; *see also* Douglas Aff. at ¶ 28.[8]

### 2. *Assumptions of Unpaid Time For Tour Supervisors ("TS"):*

The Named Plaintiff alleged that TSs also suffered two categories of damages: (i) off-the-clock time spent after their shifts ended, generally completing paperwork and handling necessary matters; and (ii) off-the-clock time spent participating in a weekly conference call.[9] The Defendants' operation at JFK Airport ran 24/7 and thus had three (3) "Tours" each day – Tour A, Tour B, and Tour C. Each Tour had two (2) TSs assigned to work during the Tour – one in "Zone 1" and one in "Zone 2." Douglas Aff. at ¶ 34, FN 1. All TSs, regardless of Zone assignment, were required to brief the incoming TS, which would require them to work off-the-clock after the end of their shift because one shift ended as the exact time the next shift began. *Id.* at ¶ 38.

---

[8]    Based on these assumptions as to the number of hours worked off-the-clock for ASAs, the Expert performed a week-by-week analysis to determine the amount of unpaid time for each week, calculated at either a straight time or overtime rate of pay, depending on their total hours worked that week, as reflected in the Shift Database. *See* Ex. 5 (sample of 10 weeks of calculations for 5 ASAs); *see also* Ex. 6 (summary of unpaid wages for all ASAs).

[9]    Plaintiff also alleged that TSs performed off-the-clock work during their meal breaks; however, the evidence revealed that despite not necessarily taking a bona fide meal break every day, all TSs were nonetheless paid for the time worked during their meal breaks.

Moreover, the Named Plaintiff's testimony and non-party witness interviews revealed that TSs who worked in "Zone 1" were often tasked with completing more post-shift work then the TSs assigned to "Zone 2." *Id.* at ¶ 40; *see also* Davis Decl. at ¶¶ 43-44. This was because, according to witness interviews, TSs who were assigned to "Zone 1" were more likely to be responsible for reviewing payroll, time sheets, vehicle reports, and incident reports. *Id.*; *see also* Davis Decl. ¶ 44.

Based on the above, Class Counsel, with the assistance of the Named Plaintiff, developed educated assumptions as to the amount of off-the-clock time worked by TSs based on the Zone they were assigned. When constructing the damages model, the Expert allocated an amount of unpaid time to a TS each day based exclusively on the Zone they were assigned to that day. Specifically, the estimates for each Zone is as follows:

1. *Zone 1* – 30 minutes every day and an additional 30 minutes (*i.e.* one-hour) 50% of the time.
2. *Zone 2* – 15 minutes every day and an additional 15 minutes (*i.e.* 30 minutes) 50 % of the time.

*Id.* at ¶ 43; Davis Decl. at ¶ 63.

Additionally, all TSs were required to participate in a weekly conference call that averaged 3 hours and took place on Tuesdays during Tour B. *Id.* at ¶ 44; Davis Decl. at ¶ 42. Thus, all TSs not working on Tuesdays during Tour B were required to participate in the call remotely and were not paid for such time worked. *Id.* Thus, the Expert allocated an additional 3 hours each week to any TS who was not working during the Tuesday B Tour.[10]

### 3. Assumptions of Unpaid Time For Operations Assistants ("OAs"):

The Named Plaintiff alleged that OAs sporadically performed post-shift off-the-clock

---

[10]    Based on these assumptions as to the number of hours worked off-the-clock for TSs, the Expert performed a week-by-week analysis to determine the amount of unpaid time for each week, calculated at either a straight time or overtime rate of pay, depending on their total hours worked that week, as reflected in the Shift Database. *See* Ex. 7 (sample of 10 weeks of calculations for 5 TSs and conference call calculation); *see also* Ex. 8 (summary of unpaid wages for all TSs).

work.[11] The Named Plaintiff, who worked for a time as an OA, testified that OAs would sporadically perform post-shift work – averaging no more than about 10 minutes every few days. *Id.* at ¶ 45-48. Class Counsel also interviewed a non-party witness who noted similar experiences during her time working as an OA. Davis Decl. at ¶¶ 56-57. The post-shift time for OAs was arguably *de minimis*; however, the parties agreed to award all OAs approximately 12-15 minutes per day of off-the-clock time in order to settle their *de minimis* claims.[12]

ii.    *Defendants Contest Plaintiff's Assumptions.*

Defendants dispute the Named Plaintiff's assumptions as to the amount of off-the-clock work performed by each of the classes. In investigating the Named Plaintiff's claims, Defendants' counsel spent considerable time interviewing employees at the JFK; observing Defendants' operations at JFK, including times employees clock in and out; conducting in-depth traffic analyses to determine the likelihood of post-shift work; and reviewing thousands of pages of timekeeping reports, compensation documents, and payroll discrepancy forms. Based on their own investigation, Defendants disagree with the assumptions and the potential range of recovery. *See generally* DE 46-13, Declaration of Wes McCart, Esq., detailing Defendants' counsel's investigation into the allegations in the Complaint and the bases on which Defendants dispute such allegations regarding the extent of off-the-clock work at JFK.

D.    **Settlement Negotiations.**

On August 9, 2018, the Parties engaged in an all-day mediation session under the direction of the mediator, David Geronemus, Esq. *Id.* at ¶ 68. During the mediation, the Parties each

---

[11]    Plaintiff also alleged that OAs performed off-the-clock work during their meal breaks; however, the evidence revealed that despite not necessarily taking a bona fide meal break every day, all OAs were nonetheless paid for the time worked during their meal breaks.

[12]    The Expert determined the amount of unpaid time each week for the OAs by multiplying the total shifts worked by all OAs by the average OA overtime pay of pay, which was $28-$30 per hour, and then multiplying that sum by the 15 minutes of assumed off-the-clock time. *See* Ex. 9 (summary of unpaid wages for all OAs).

presented their legal and factual assessments of the case and discussed the merits of the Parties' positions. *Id.* at ¶ 69. As set forth above, the damages calculations were performed by an Expert. *Id.* at ¶70. Class Counsel presented a demand for each of the sub-Classes separately and negotiated the damages for each separately. *Id.* Unfortunately, the Parties were not able to reach resolution during the first mediation session. *Id.* at ¶ 71. However, the Parties felt they were close to reaching a resolution and thus scheduled a follow-up mediation session for the following week. *Id.* at ¶ 72. As such, on August 16, 2018, the Parties engaged in their second full-day mediation before Mr. Geronemus. *Id.* at ¶ 73. During the week between the mediation sessions, the Parties performed detailed analyses of the distances between each of the various posts and Building 14 to more accurately assess how long it would take for ASAs to be relieved from their post and drive back to Building 14 both during lunch and post-shift. *Id.* at ¶ 74.

In Class Counsel's estimation and weighed in light of the attendant risks presented by litigating this matter further, the settlement reached represents a meaningful percentage of the recovery that the class/collective members would have achieved had they achieved conditional class and/or collective action certification, defeated Defendants anticipated motion(s) for decertification, prevailed on all of their claims at trial, survived an appeal, and sought to enforce and collect upon a judgment. *Id.* at ¶ 76. Specifically, based on Class Counsel's damages assessment of the underpayment, as set forth in detail above, the recovery on the dollar calculated on the Gross Settlement, is as follows: (1) for the ASA Class – approximately 90 cents ($0.90) on the dollar for their underpayment for post-shift drive time from the nearby, remote, and semi-remote posts back to Building 14; 50 cents ($.50) on the dollar for their underpayment for work performed during unpaid lunches traveling from remote and semi-remote posts back to Building 14; (2) for the OA Class – approximately 100 cents ($1.00) on the dollar for the underpayment for

work performed post-shift by sporadically staying late to complete tasks; and (3) for the TS Class – approximately 90 cents ($.90) on the dollar for their underpayment for post-shift work completing paper work and off-the-clock conference call time. *Id.* at ¶ 77.

The parties papered the settlement agreement and the Named Plaintiff submitted it to this Court as part of his Unopposed Motion for Preliminary Approval on November 30, 2018. *Id.* at ¶ 105. An in-person hearing on the motion was then held on February 4, 2019 before Your Honor. *Id.* at ¶ 106. During the hearing, the Court requested the Parties provide revised submissions to address questions raised by the Court, which the Parties did, by a joint letter, on February 18, 2019. *Id.* at ¶ 107; *see also* DE 41. Thereafter, the Court denied the motion and directed the Parties to provide a revised settlement agreement and memorandum of law explaining the propriety of any new proposed settlement consistent with the Court's Order. *See* DE 44. The Parties made a Joint Motion for Reconsideration, which was denied. *See* DEs 45 and 47. Nonetheless, the Parties were still committed to settling this matter and therefore, based on the Court's Orders, the Parties re-visited the non-monetary terms of settlement agreement and re-negotiated certain material non-monetary terms consistent with the Court's Order. Davis Decl. ¶¶ 78-80, 110.

At all times during the settlement negotiation process, negotiations were conducted on an arm's-length basis and constituted a reasonable compromise of a bona fide dispute involving a myriad of vigorously contested legal and factual issues.

### D.    The Plaintiff's Unopposed Motion for Preliminary Approval.

The Named Plaintiff, on behalf of the Class and Collective, submitted an unopposed motion for preliminary approval of the settlement agreement reached, which was subsequently denied by the Court. *See* DE 44. The Parties were nonetheless committed to resolution of this matter and revisited the terms of their settlement agreement with which the Court raised concerns, including

the FLSA opt-in procedure, continued to negotiate certain other non-monetary terms of the agreement, and made modifications according to the Court order as reflected in the Amended Settlement Agreement. *See* Ex. 1.

Thereafter, on September 13, 2019, the Named Plaintiff, without opposition, moved again for preliminary approval of the Amended Settlement, scheduling of a final fairness hearing, and related relief, including, appointment of Plaintiffs' counsel as class counsel and approval of the proposed Class Notices. *Id.* at ¶ 111; *see also* DEs 52-54. On October 10, 2019, the Court granted the Plaintiffs' Unopposed Motion for Preliminary Approval in part and denied in part. *Id.* at ¶ 112; *see also* DE 55. Prior to approving the Motion, on August 22, 2019, the Court approved a revised version of the Notice for distribution to the Class Members, which was submitted a month prior to the Motion for Preliminary Approval. *Id.* at ¶ 113; *see also* DE 50.

### E.  Summary of the Notice and Claims Administration Process.

RG/2 Claims Administration ("RG/2") has served as the Settlement Claims Administrator. *Id.* at ¶ 114. On November 1, 2019 RG/2 received an electronic file from Defendants' counsel, containing the Class Members' the names, known contact information, employee identification numbers and job posts for the present and former employees of Defendants, who were employed at JFK as ASAs, OAs, or TSs at any time between September 1, 2013 and May 28, 2019, and who were identified as Class Members (the "Class List"). *See* Baldwin Declaration, attached to Davis Decl. as Ex. 10, at ¶ 5 (hereinafter, "Baldwin Decl."). The Class List contained data for 721 potential Class Members, of which 595 were also potential FLSA Collective Members. *Id.* The mailing addresses contained in the Class List were processed and updated utilizing the National Change of Address Database ("NCOA") maintained by the U.S. Postal Service. *Id.* at ¶ 8. The Class List was also provided to the Expert in order to calculate the appropriate number of points

attributable to each Class Member pursuant to the allocation formula set forth in detail in Section II(C), below. Davis Decl. at ¶ 90. After the Expert calculated the number of points attributable to each Class Member, the points were provided to RG/2 determined each Class Member's approximate Total Settlement Share. *Id.* at ¶ 90; *see also* Ex. 10 at ¶ 5.

On November 12, 2019, RG/2 caused to be served to the 595 Class and Collective Members by First Class U.S. Mail the personalized *Notice of Proposed Class and Collective Action Lawsuit Settlement and Final Fairness Hearing* (the "Notice") and *Consent to Join Form* (referred to collectively as the "Notice Packet"). Ex. 10 at ¶ 6. RG/2 also mailed personalized *Notice of Proposed Class and Collective Action Lawsuit Settlement and Final Fairness Hearing* (without the Consent to Join Form) to the 126 Class Members who were deemed to only have state law claims. *Id.* In total, 721 Notices were mailed out. *Id.* Each Notice was prepopulated with the Class Member's applicable positions, weeks worked in the applicable positions and estimated settlement payment. *Id.* The Notice was also served by email to all Class Members whom Defendants had an email address for in their records. *Id.* at ¶ 7. This email Notice included an online portal for the FLSA Collective Members to file their Consent to Join Form electronically. *Id.*

The Notice advised Class Members that they could submit a written exclusion request, by using the provided Opt-Out Statement form, postmarked by January 7, 2020. *Id.* at Exhibit A. The Notice also advised Class Members of their right to object to the settlement by submitting a letter directly to RG/2 by stating "I object to the Settlement proposed in the *Douglas v. Allied* litigation as it relates to my rights under the Settlement Agreement" on or before January 7, 2020. *Id.* Finally, the Notice advised anyone who was employed as an ASA, OA or TS from May 16, 2015 to May 28, 2019 (the FLSA Collective Members), of their right to opt-in to the FLSA Collective by submitting a Consent to Join Form, which was included therein, any time before the Final Fairness

Hearing. *Id.* An FLSA Collective Member was able to submit a Consent to Join Form via mail, email, fax and/or through an online portal at https://rightsignature.com/forms/Allied-ConsentFor-87fd0d/token/5b312016490. *Id.* From January through March 2020, Class Counsel reached out to every FLSA Collective Member who had not yet filed a Consent to Join Form to ensure that they had received the Notice Packet and were aware of their right to participate in this Settlement. Davis Decl. at ¶ 120. Additionally, in February 2020, with Class Counsel's consent, Defendants posted a sign, visible to any current ASAs, OAs or TSs, that answered certain questions presented by FLSA Collective Members and reiterated that no one would be penalized or retaliated for participating in this Settlement. *Id.* at ¶ 121.

To date, 51 Notices and Notice Packets were returned by the United States Postal Service ("USPS") as undeliverable. *Id.* at ¶ 9. Of the 51 returned, the USPS provided forwarding addresses for 7 and new Notices or Notice Packets were promptly re-mailed. *Id.* RG/2 Claims performed address searches for the remaining Notices that were returned as undeliverable and was able to locate new addresses for 33  of the remaining undeliverable Notices. *Id.* New Notices were re-mailed to these 33 Class Members whose addresses were located through RG/2 Claims' address searches. *Id.* Stated otherwise, 710 of the 721 Notices (*i.e.*, 98.47%) have not been returned as undeliverable and are presumed to be successfully delivered to the eligible Class Members. *Id.*

As of March 13, 2020, RG/2 has received one (1) request for exclusion from the Settlement. *Id.* at ¶ 10. To date, RG/2 has also received 424 Consent to Join Forms from FLSA Collective Members. *Id.* at ¶ 12. As such, the participation rate in the FLSA Collective, which contained 595 Collective Members, is 71.26%.  *Id.* The Parties will update the Court at the Final Fairness Hearing if any additional Consent to Join Forms are received between the date of the filing of this motion and the Final Fairness Hearing on March 23, 2020, which pursuant to the Settlement Agreement

is the deadline by which Consent to Join Forms must be received. Additionally, there was one (1) objection to the Settlement, which failed to comply with the procedural requirements for objecting – notably, the objection was mailed directly to the Court, not the RG/2 as instructed in the Notice. Davis Decl. at ¶ 11. The Parties learned about the objection when the Court filed it on the docket on February 14, 2020 in order for the Parties to address per the claims administration process. *See* DE 56. The Parties' response to the objection is set forth in Section IV(B)(2), below.

## II.   <u>OVERVIEW OF THE SETTLEMENT TERMS.</u>

### A.   <u>The Settlement Fund.</u>

The Settling Parties agreed to settle this case for a Total Settlement Amount of up to two million five hundred and twenty thousand dollars ($2,520,000.00). Ex. 1 at ¶ 2.28. The Total Settlement Amount covers the Net Settlement Amount, including court-approved attorneys' fees and costs for Class Counsel, court-approved Service Awards to Kirk Douglas, Claims Administration fees and costs, and standard employer-side tax obligations, including the Employer Federal Insurance Contributions Act (FICA) amount. *Id.* at ¶¶ 2.28; 4.1.

To qualify for payment of their state law claims, Class Members do not need to do anything. *Id.* at ¶ 2.3; 2.26. To qualify for payment of FLSA Claims, if any, a Collective Member must have submitted the Consent to Join Form. *Id.* at ¶ 2.22; 2.26. No payments shall be made to the one (1) Class Member who has requested to be excluded.

### B.   <u>Releases.</u>

The Settlement Agreement provides that Claimants (*i.e.* Class Members who do not submit an Opt-Out Statement) are deemed to have released the Releasees from any and all liability, damages, expenses, or costs arising under the NYLL and any other applicable state or local wage and hour law, including without limitation claims for attorneys' fees and costs arising therefrom,

for the entire Class Period (the "State/Local Release"). *Id.* at ¶ 5.1. In addition to the State/Local Release, each Opt-in Claimant (*i.e.* Collective Members who submit a Consent to Join Form) shall be deemed to have released the Releasees from any and all liability, damages, expenses, or costs arising under the FLSA, including without limitation claims for attorneys' fees and costs arising therefrom for the entire Collective Period (the "FLSA Release"). *Id.* at ¶ 5.2.

### C.   <u>Allocation Formula.</u>

Each Claimant/Opt-in Claimant's individual settlement sum is determined on a pro rata basis based on points allotted for various shifts and/or post assignments. Davis Decl. at ¶ 87. Specifically, each Claimant/Opt-in Claimant will receive an allocated amount from each of the sub-Class(es) they fall within. *Id.* at ¶ 88. Each Settlement Check will be the portion of the Total Settlement Share to which each Claimant/Opt-in Claimant are entitled to, calculated as follows:

- The ASA Class will be allocated 78% of the Net Settlement Amount (the "ASA Settlement Fund"). To calculate each ASA Class Member's individual settlement share they will be awarded two points for every shift worked at a "remote post", one point for every shift worked at a "semi-remote post", and one-half point for every shift worked at a "nearby post" during the Class Period. Each ASA Class Member will then receive their pro-rata share of the ASA Settlement Fund based on their total awarded points (their "Individual ASA Settlement Share"). *Id.* at ¶ 89(a); *see also* Ex. 1 at 4.3.

- The TS Class will be allocated 20% of the Net Settlement Amount (the "TS Settlement Fund'). To calculate each TS Class Member's individual settlement share they will be awarded three points for every time they worked Zone 1, and one and a half points every time they worked Zone 2 during the Class Period; and eight points for every week they were not working during the Tuesday B Tour during the Class Period. Each TS Class Member will then receive their pro-rata share of the TS Settlement Fund based on their total awarded points (their "Individual TS Settlement Share"). *Id.* at ¶ 89(b); *see also* Ex. 1 at 4.3.

- The OA Class will be allocated 2% of the Net Settlement Amount (the "OA Settlement Fund'). To calculate each OA Class Member's individual settlement share they will be awarded one point for every day they worked as an OA during the Class Period. Each OA Class Member will then receive their pro-rata share of the OA Settlement Fund based on their total awarded points (their "Individual OA Settlement Share"). *Id.* at ¶ 89(c); *see also* Ex. 1 at 4.3.

The total amount of the Net Settlement Amount attributed to FLSA Claims versus NYLL Claims shall be fifty percent (50%) of the FLSA Collective Members' combined Total Settlement Shares (the FLSA Settlement Allocation"). Ex. 1 at ¶ 4.4. As such, if (1) a Claimant is not an FLSA Collective Member, he or she shall receive 100% of his or her Total Settlement Share; (2) a Claimant is an FLSA Collective Member, but failed to become an Opt-in Claimant, he or she shall receive only 50% of his or her Total Settlement Share; (3) a Claimant is an FLSA Collective Member, and became an Opt-in Claimant, he or she shall receive 100% of his or her Total Settlement Share; and (4)  an individual is an Opt-in Claimant but not a Claimant the Opt-in Claimant shall receive 50% of his or her Total Settlement Share. *Id.*

Each Settlement Check will be attributed as follows: one-third as a wage payment, and two-thirds as 1099 non-wage income. *Id.* at ¶ 4.8.A. The employer-side tax obligations, including FICA, shall be paid from the Total Settlement Amount. *Id.* at ¶ 4.1.

### D. **Attorneys' Fees and Litigation Costs.**

Consistent with accepted practice for "common fund" settlement agreements, Class Counsel separately moved for payment from the Gross Settlement Amount for (a) litigation costs and expenses, included Settlement Administration Costs not to exceed seventy thousand ($70,000) and (b) attorney fees of seven-hundred forty thousand ($740,000), representing 29.36% of the Gross Settlement Amount. *Id.* at ¶ 4.6. Pursuant to Federal Rules of Civil Procedure 23(h) and 54(d)(2), Class Counsel has filed, on the same day this Motion was filed, a Motion for Approval of Attorneys' Fees and Reimbursement of Expenses.

### E. **Service Payments.**

In addition to his individualized award under the allocation formula, the Class Representative – Kirk Douglas – will apply for a payment in the form of an Enhancement Award

as recognition of the services he rendered on behalf of the Class. Mr. Douglas will apply to receive no more than twenty thousand dollars ($20,000) total as a service award. *Id.* at ¶ 4.2.

The Enhancement Award has been allocated to Mr. Douglas because he has been instrumental in litigating this matter. Davis Decl. at ¶ 96. Mr. Douglas served the Class by assisting with the preparation of the Complaint, the factual investigations of claims, the drafting and executing of his declaration, answering interrogatories, and reviewing and explaining documents. *Id.* at ¶ 98. In addition, Mr. Douglas also prepared for, attended and participated in both mediations, each of which were full days and required that he take such days off of work. *Id.* at ¶ 99. Mr. Douglas also provided crucial information on Defendants' policies regarding overtime compensation, work performed by ASAs post-shift and during lunch breaks, work performed by OAs post-shifts, and work performed by TSs post-shift and during off-the-clock conference calls, and other evidence corroborating collective and/or class-wide treatment that were useful in mediation. *Id.* at ¶ 100. Mr. Douglas, both in-person and via phone calls, also assisted in reviewing evidence produced by Defendants and provided critical information in interpreting the actual wages they were paid, their hours worked, the nature of their duties and responsibilities, and other information relevant to their claims. *Id.* at ¶ 101.

The parties have agreed to set aside up to $20,000 from the Gross Settlement Amount for the Enhancement Award to be distributed to Mr. Douglas. Ex. 1 at ¶ 3.3. Service Awards of this type are commonly awarded in wage and hour litigation. *See Damassia v. Duane Reade, Inc.*, No. 04 Civ. 8819, No. 06 Civ. 2295, 2009 WL 5841128, at *4 (S.D.N.Y. July 27, 2009).

## III.   PLAINTIFFS SUBMIT THAT THE RULE 23 SETTLEMENT CLASS MEETS THE LEGAL STANDARD FOR CLASS CERTIFICATION.

Plaintiffs submit that, for settlement purposes, there is a basis to certify a class under

Federal Rule of Civil Procedure 23(e).[13] Specifically, Plaintiffs respectfully request that the Court certify the following settlement class under Federal Rule of Civil Procedure 23(a) and (b)(3) (the "Class") for purposes of effectuating the settlements:

> All present and former persons employed as Airport Security Agents, Operation Assistants, or Tour Supervisors at JFK by Defendants at any time between September 1, 2013 and May 28, 2019.

Under Rule 23(a), a class action may be maintained if all the prongs of Rule 23(a) are met, as well as one of the prongs of Rule 23(b). Rule 23(a) requires that (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

A.    **Numerosity.**

Numerosity is satisfied when the class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Impracticable does not mean impossible." *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993). "There is no 'mechanical test' to determine whether ... numerosity has been met nor is there a set rule for the number of prospective class members which must exist before a class is certified." *Globe Surgical Supply v. GEICO Ins. Co.*, 59 A.D.3d 129, 137-38 (2008); *see also Koss v. Wackenhut Corp.*, 03 CIV. 7679 (SCR), 2009 WL 928087, *3 (S.D.N.Y. Mar. 30, 2009) (citations omitted). While "numerosity is presumed at a level of 40 members" in the Second Circuit the court makes its "[d]etermination of practicability [ ] on all the circumstances surrounding a case, not on mere numbers." *Robidoux,* 987 F.2d at 936.

---

[13]    Defendants do not concede that class or collective certification of any of the claims asserted would be proper in contested litigation, and they have expressly reserved their right to contest class or collective certification in this matter (should the settlement not be approved) or in any other matter alleging the same or similar claims.

In assessing numerosity, courts consider a number of factors including: (1) judicial economy arising from the avoidance of multiplicity of actions; (2) geographic dispersion of class members; (3) financial resources of class members; (4) the ability of claimants to institute individual suits; and (5) requests for prospective injunctive relief which would involve future class members." *Gortat v. Capala Bros., Inc.,* 07-cv-3629-ILG-SMG, 2012 WL 1116495, at *3 (E.D.N.Y. April 2, 2017) (citing *Robidoux,* 987 F.2d at 936). The court is not limited in its analysis to the *Robidoux* factors, however, and is "empowered to make common sense assumptions to support a finding of numerosity." *Nicholson v. Williams,* 205 F.R.D. 92, 98 (E.D.N.Y.2001). As such, courts will certify classes even where the class size is less than 40 members. *See e.g. Odom v. Hazen Transp., Inc.*, 275 F.R.D. 400, 407 (W.D.N.Y. 2011) (certified a settlement class of 16).

Here, the ASA Class – 704 – clearly satisfies numerosity. Additionally, the above factors, and the courts common sense assumptions, support certification of the smaller TS and OA Classes. Specifically, the OA Class is 46 individuals and the TS Class is 35 individuals. Here, judicial economy favors the avoidance of numerous potential individual suits and the financial resources of the individual class members, who are only paid approximately $20-$30 per hour, are limited. Therefore, the court should find numerosity for the TS Class, which is below 40. Also, Defendants consent supports the Courts finding of numerosity.

**B.   Commonality.**

Plaintiffs submit that the proposed settlement class also satisfies the commonality requirement, the purpose of which is to test "whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157 n.13 (1982). Although the claims need not be identical, they must share common questions of fact or law. *Port*

*Auth. Police Benev. Ass'n, Inc. v. Port Auth. of N.Y. & N.J.*, 698 F.2d 150, 153-54 (2d Cir. 1983). Courts construe the commonality requirement liberally. *Id.*

Plaintiffs submit that this case involves numerous common issues. Notably, one such common issue is that Defendants allegedly subjected Plaintiffs to the same unlawful compensation policies and practices – namely, failing to pay Class Members for "off-the-clock" working time, including compensable time worked after their scheduled shifts and during lunch breaks.

Plaintiffs contend that common issues in this case – ones that will generate a common answer – are whether or not Defendants' unlawful policies and practices set forth above, including, *inter alia*: failing to compensate for all post-shift work, violates the FLSA and NYLL. *See, e.g.*, *Lassen v. Hoyt Livery Inc.*, 3:13-cv-1529, 2014 WL 4638860, at *9 (D. Ct., Sep. 17, 2014) (finding commonality where it was undisputed that all class members were subject to at least one uniform policy, "the legality or illegality of [which] ... provide[d] the unifying thread to satisfy the commonality requirement of Rule 23(a)(2)."). In the absence of class certification and settlement, individual Class Members would be forced to individually litigate each of these issues of fact.

**C.**   **Typicality.**

Rule 23 requires that the claims of the representative party be typical of the claims of the class. "Like the commonality requirement, typicality does not require the representative party's claims to be identical to those of all class members." *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 182 (W.D.N.Y. 2005). Typicality is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (internal quotations omitted). "Minor variations in the fact patterns underlying individual claims" do not defeat typicality when the defendants direct "the same unlawful conduct" at the named plaintiff and the

class. *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993).

The Named Plaintiff contends that his claims arose from the same factual and legal circumstances that form the basis of the Class Members' claims. The Named Plaintiff contends that all ASAs, OAs and TS's who worked for Defendants at JFK were at least subject to the same common policies and practices. *See* DE 1; *see also* Davis Decl. at ¶¶ 3-5. The Named Plaintiff, who worked in each of the three positions throughout his employment, also shared the same job titles of the Class Members –ASA, OA, and TS– and the same job duties. *Id*. Additionally, the Named Plaintiff's claim the same alleged common unlawful practices, namely, that Allied failed to record off-the-clock work, mainly during post-shift work, and consequently failed to properly pay them for all hours worked. *Id*. These practices allegedly subjected the Named Plaintiff and those similarly situated to overtime work without proper compensation. *Id*. The Class Members also commonly allege that Defendants failed to keep accurate records of time worked. *Id.*

The Named Plaintiff submits that his alleged wage and hour claims arise from the same factual and legal circumstances that form the basis of the Class Members' claims, and so they contend that they satisfy the typicality requirement. *See Frank*, 228 F.R.D. at 182 (finding that class members satisfied the typicality requirement where "all class members . . . allege that Kodak failed to pay them . . . overtime wages for hours worked in excess of forty per week during the relevant time period"); *Perez v. Allstate Ins. Co.*, No. 11-cv-1812 (JFB), 2014 WL 4635745, at *3 (E.D.N.Y. Sept., 16, 2014) (holding that "[b]ecause plaintiffs have established that [plaintiffs insurance a]djusters across New York, including the named plaintiffs, shared common job duties, plaintiffs have met the typicality requirement.").

### D.    Adequacy of the Named Plaintiff and Class Counsel.

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the

interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy requirement exists to ensure that the named representative will have an interest in vigorously pursuing the claims of the class, and . . . have no interests antagonistic to the interests of other class members." *Toure v. Central Parking Systems of New York*, 05-cv-5237, 2007 WL 2872455, at *7 (S.D.N.Y. 2007) (citation and internal quotation marks omitted). "[O]nly a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status." *Dziennik v. Sealift, Inc.*, No. 05 Civ. 4659, 2007 WL 1580080, at *6 (E.D.N.Y. May 29, 2007) (citation and internal quotation marks omitted). There is no evidence that the Named Plaintiff has any interests that are or would be antagonistic or at odds with Class Members. *See Diaz v. Eastern Locating Service Inc.*, 10-cv-4082, 2010 WL 2945556, at *2 (S.D.N.Y. July 22, 2010).

The Named Plaintiff also submits that his counsel meets the adequacy requirement of Rule 23(a)(4) because its "experience, knowledge of this area of law, work invested in identifying the potential claims in this action, and ability to commit sufficient resources to representing the class also satisfy the Rule 23(g) requirements for appointment as class counsel." *Spicer v. Pier Sixty, LLC*, 269 F.R.D. 321, 337-338 (S.D.N.Y 2010) (citations omitted). Accordingly, reference to the Davis Declaration supports the conclusion that counsel is qualified and the requirements of 23(a)(4) are met. *Id.* at ¶¶ 137-159. Among other things, The Law Office of Christopher Q. Davis has previously been appointed as Class Counsel in numerous class litigations. *Id.*

### E.    Certification is Proper Under Rule 23(b)(3)

Rule 23(b)(3) requires that common questions of law or fact not only be present, but also that they "predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This inquiry examines "whether proposed classes are

sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

Certification under Rule 23(b)(3) allows Class Members to opt out of the settlement and preserve their right to seek damages independently. This approach protects Class Members' due process rights and is consistent with the Supreme Court's decision in *Ortiz v. Fibreboard Corp.*, which explains that due process requires an opportunity to opt out of significant monetary relief. *Ortiz*, 527 U.S. 815, 846-48 (1999).

    1.  *Common Questions Predominate.*

To establish predominance, plaintiffs must demonstrate that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole . . . predominate over those issues that are subject only to individualized proof." *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 108 (2d Cir. 2007). The essential inquiry is whether "liability can be determined on a class-wide basis, even when there are some individualized damage issues." *Marriott v. County of Montgomery*, 227 F.R.D. 159, 173 (N.D.N.Y. 2005) (quoting *In re Visa Check/MasterMoney Antitrust Litig*, 280 F.3d 124, 139 (2d Cir. 2001)).

Here, the Named Plaintiff contends that Class Members' common factual allegations and common legal theory – that Defendants violated federal and state wage and hour laws by requiring off-the-clock work that resulted in unpaid wages – predominate over any factual or legal variations among class members. *See Torres v. Gristede's Corp.*, No. 04 Civ. 3316, 2006 WL 2819730, at *16 (S.D.N.Y. Sept. 29, 2006) (plaintiffs "introduced sufficient proof that Defendants engaged in a common practice to deny employees overtime pay," and "this issue predominates over any individual calculations of overtime wages").

2.    *A Class Action is a Superior Mechanism.*

The second part of the Rule 23(b)(3) analysis is a relative comparison examining whether "the class action device [is] superior to other methods available for a fair and efficient adjudication of the controversy." *Green v. Wolf Corp.*, 406 F.2d 291, 301 (2d Cir. 1968); *see also Amchem*, 521 U.S. at 617. Rule 23(b)(3) sets forth a non-exclusive list of factors pertinent to judicial inquiry into the superiority of a class action, including: the class members' interest in individually controlling the prosecution or defense of separate actions; whether individual class members wish to bring, or have already brought, individual actions; and the desirability of concentrating the litigation of the claims in the particular forum. Fed. R. Civ. P. 23(b)(3).[14]

Here, the Named Plaintiff and the Class Members have limited financial resources with which to prosecute individual actions with smaller individual damages amounts. To date, Plaintiff is only aware 3 other individual class members who have already brought individual actions regarding the wage and hour violations alleged in this matter. Regarding the forum, the Named Plaintiff contends that concentrating the litigation in this Court is desirable because the great majority of the allegedly wrongful conduct occurred within the jurisdiction of this Court and will conserve judicial resources. *See Damassia v. Duane Reade*, 250 F.R.D. 152, 164 (S.D.N.Y. 2008).

## IV.    FINAL APPROVAL IS APPROPRIATE PURSUANT TO RULE 23(e) BECAUSE THE SETTLEMENT IS FAIR, ADEQUATE, AND REASONABLE.

Rule 23(e) requires court approval of a class action settlement to ensure that it is procedurally and substantively fair, reasonable, and adequate. Fed. R. Civ. P. 23(e). To determine whether a settlement is procedurally fair, courts examine the negotiating process leading to the

---

[14]    Another factor, whether the case would be manageable as a class action at trial, is not of consequence in the context of a proposed settlement. *See Amchem*, 521 U.S. at 620 ("[c]onfronted with a request for settlement-only class certification, a [trial] court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial").

settlement. *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001). To determine whether a settlement is substantively fair, courts determine whether the settlement's terms are fair, adequate, and reasonable according to the factors set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974).

### A.     The Proposed Settlement is Procedurally Fair.

The Settlement is procedurally fair because it was reached through arm's-length negotiations after experienced counsel had conducted substantial discovery, allowing them to evaluate the merits of the Plaintiffs' claims. *See Khait v. Whirlpool Corp.*, No. 06 Civ. 6381, 2010 WL 2025106, at *5 (E.D.N.Y. Jan. 20, 2010). A "presumption of fairness, adequacy and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Wal-Mart Stores*, 396 F.3d at 116; *see also D'Amato,* 236 F.3d at 85. "Absent fraud or collusion, [courts] should be hesitant to substitute [their] judgment for that of the parties who negotiated the settlement." *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, No. 05 Civ. 10240, 2007 WL 2230177, at *4 (S.D.N.Y. July 27, 2007).

Here, the settlement was reached after Class Counsel had conducted a thorough investigation, evaluated the claims and defenses, and negotiated extensively with Defendants. Plaintiffs obtained payroll records, job descriptions, ESI, policy documents, and interviewed the Named Plaintiffs and third-party witnesses, all of which enabled them to perform accurate damages calculations. Davis Decl. ¶¶ 18-28. Class Counsel performed damages calculations, through an expert witness, based on the information secured, including payroll records for the entire Class. *Id*. at ¶¶ 60-66. The Parties also had lengthy discussions setting forth their legal positions. *Id.* at ¶ 69. From these sources, counsel for the Parties evaluated the strengths and weaknesses of the claims and defenses.

Thereafter, on or about August 9, 2018, the  participated in a full day mediation before David Geronemus, Esq., an experienced and well-respected negotiator, which was ultimately unsuccessful. *Id.* at ¶ 68. The Parties felt they were close to reaching a resolution and thus scheduled a follow-up mediation session for the following week. *Id.* at ¶ 72. As such, on August 16, 2018, the Parties engaged in their second full-day mediation before Mr. Geronemus. *Id.* at ¶ 73. During the week between the mediation sessions, the Parties performed detailed analyses to more accurately assess the assumptions made as to off-the-clock time worked. *Id.* at ¶ 74. These arm's-length negotiations between counsel, involving a well-respected neutral mediator who specializes in this area of the law, creates a presumption that the settlement achieved meets the requirements of due process. *See Wal-Mart Stores*, 396 F.3d at 116.

**B.  <u>The Proposed Settlement is Substantively Fair.</u>**

In evaluating a class action settlement, courts in the Second Circuit generally consider the nine factors set forth in *Grinnell*. *See City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974). The *Grinnell* factors are (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial;  (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *Id.* at 463. All the *Grinnell* factors weigh in favor of final approval of the Settlement Agreement.

1.  <u>*Litigation Through Trial Would be Complex, Costly, and Long (Grinnell Factor 1).*</u>

By reaching a favorable settlement prior to dispositive motions or trial, the Named Plaintiff

seeks to avoid significant expense and delay, and instead ensure recovery for the class. "Most class actions are inherently complex, and settlement avoids the costs, delays and multitude of other problems associated with them." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 174 (S.D.N.Y. 2000), *aff'd sub. nom. D'Amato*, 236 F.3d 78. This case is no exception, with approximately 721 Class Members across three (3) sub-classes. *See* Davis Decl. ¶ 7.

Although the Parties have already undertaken time and expense investigating and preliminarily litigating this matter, further litigation without settlement would necessarily result in substantial additional expense and delay. Plaintiffs would move for class and collective certification; which Allied would vigorously oppose. A full discovery schedule would be required, including the potential for expensive electronic and expert discovery. And, to the extent certification was granted, preparing and putting on evidence on the pertinent factual and legal issues would consume tremendous amounts of time and resources for both sides, as well as require substantial judicial resources to adjudicate the parties' disputes. A further trial of the damages issues, even if permitted on a representative basis (again, a disputed point), would be costly and further delay closure. In addition, even after judgment, there would the potential for appeal, thereby extending the duration and expense of the litigation. This Settlement, on the other hand, makes monetary relief available to Class Members in a prompt and efficient manner. Therefore, the first *Grinnell* factor weighs in favor of final approval.

2.       *The Reaction of the Class Has Been Mostly Positive (Grinnell Factor 2).*

Notice of the settlement has been issued to the Class Members and the reaction has been mostly positive. To date, there has only been one (1) objection to the Settlement and only one (1) Class Member opted-out of the settlement by submitting a request for exclusion. Baldwin Decl. ¶¶ 10, 11; *see also* Davis Decl. at ¶ 119. The participation rate for the Class is nearly 99.9% which is

extremely high, even in an opt-out settlement. Moreover, of the 595 FLSA Collective Members, 424 have submitted Consent to Join Forms to participate in the portion of their settlement that represents their FLSA claims. Ex.10 at ¶ 12. The participation rate for the Collective is 71.26% which is well above average for a settlement that requires individuals to actively submit form to participate. *See e.g., Hernandez v. Immortal Rise, Inc.*, 306 F.R.D. 91, 100 (E.D.N.Y. 2015) *citing* 2 McLaughlin on Class Actions § 6:24 (8th ed.) ("Claims-made settlements typically have a participation rate in the 10-15 percent range.").

Numerous federal courts have held that even a relatively high percentage of objectors or opt outs will not necessarily preclude approval of a class settlement. *See, e.g., Grant v. Bethlehem Steel Corp.,* 823 F.2d 20, 23 (2d Cir. 1987) (citing numerous cases in which class settlements were approved despite the fact that significant percentages, ranging from 15% to 56%, of relevant Class Members opted out of the settlement or otherwise objected); *see also U.S. v. City of New York*, 2015 WL 1063403, at *14 (E.D.N.Y. 2015) (approving settlement were 6.7% of eligible claimants (98 out of 1,470), a relatively small percentage, objected).

Here, (1) objection was filed by Mr. Kevin McNamara, representing 0.139% of the Claimants. Davis Decl. ¶ 122; *see also* DE 56. The sole basis for Mr. McNamara's objection is his belief that he is entitled to more money under the settlement.[15] *Id.* at ¶ 125. However, much of the overtime Mr. McNamara claims to have worked as a TS in his objection is actually outside the scope of those alleged in this Litigation because they were not common responsibilities shared amongst all TSs. *Id.* at ¶ 126. Specifically, Mr. McNamara's objection included allegations of overtime worked pursuant to his additional duties as a "Driving Instructor" and "Fire Safety Director". *Id.* at ¶ 127; *see also* DE 56. Based on Class Counsel's investigation, these duties are

---

[15]     It is worth noting that Mr. McNamara's individual settlement sum is over $22,000. *Id.* at ¶ 124.

typical across all TSs and therefore were not pled in the Complaint. *Id.* at ¶ 128.

Moreover, Mr. McNamara's credibility is called into question since his sworn deposition testimony in connection with a related litigation before this Court flatly contradicts certain statements made in his objection. *Id.* at ¶ 129; *see also* Ex. 11 at 48:22-25 (responding to question of whether he worked overtime regularly when employed by Allied, Mr. McNamara responded "Not regularly, no. When the account – when the client requested it, I did it.").

According to Mr. McNamara's testimony, it "wasn't necessary" to stay after his shift to finish his work for the day because "[i]f you did your job correctly, you accomplish everything within your time frame." Ex. 11 at 50:4-11. Circumstances that could have caused a TS to stay late, as pled in the Complaint and set forth in Mr. McNamara's objection, generally included investigations into "vehicle accidents." *Id.* at 50:12-23. However, according to Mr. McNamara the number of accidents was "down to maybe two a month" after the first year and only "one or none a year" by the time he left Allied's employ. *Id.* at 50:24-51:9; *see also Id.* at 305:5-13 ("first year [of Allied's contract with Port Authority] we only had 26 accidents…[a]fter that, on the following year, maybe there were only four accidents, so…"). Despite some evidence that post-shift time worked for TSs was more sporadic, this Settlement nonetheless assumed that all TSs in Zone 1 worked between 30 minutes to one-hour of uncompensated overtime ***each day*** and all TSs in Zone 2 worked between 15 to 30 minutes of uncompensated overtime ***each day***. *See* Section I(C)(i)(2), *supra* (assumption totaled approximately 6-15 hours of overtime each month for the TSs, depending on which zone they were assigned). This Settlement also assumed uncompensated time for an additional 3 hours every week for TSs to participate in weekly conference calls. *Id.* However, Mr. McNamara actually testified that such calls "weren't very often." Ex. 3 at 331:9-19. Finally, Mr. McNamara testified that he did not even regularly work 10 hours of overtime a month,

which is the approximate amount of overtime assumed for his role as a TS under this settlement. *Id.* at 310:13-311:8.  In fact, Mr. McNamara testified that in the full year before he left JFK, **he did not work any unpaid overtime**. *Id.* at 310:6-12 (in response to the question, "In the year before you left JFK, approximately how many hours a month did you work late that you weren't paid for?", Mr. McNamara responded, "None.").

As such, Mr. McNamara's objection does not, and cannot, provide grounds for the Court to reject this Settlement. *See e.g. Vaccaro v. New Source Energy Partners L.P.*, 15-cv-8954, 2017 WL 6398636, at *5 (S.D.N.Y. Dec. 14, 2017) (finding the substantive points made by the objector, including that the settlement amount was inadequate, are without merit and approving the settlement); *In re Currency Conversion Fee Antitrust Litigation*, 263 F.R.D. 110, 125 (S.D.N.Y. 2009) (finding that a court should not reject a settlement because of objections based on complaints that class member would be entitled to more if they prevailed at trial); *Thomas v. Albright,* 139 F.3d 227, 234 (D.C.Cir.1998) ("The court should not reject a settlement merely because individual class members complain that they would have received more had they prevailed after a trial."). Most notably a settlement may pass judicial muster even though some members of the class prefer different remedies. The court's fiduciary duty to class members entails not only protecting an objecting minority, ***but also protecting a non-objecting majority from a "veto" by a single dissenting member***. *See Martens v. Smith Barney, Inc.,* 181 F.R.D. 243, 265 (S.D.N.Y. 1998). The vast majority of the Class Members favored the settlement. In fact, the remaining 719 Claimants, including the other 34 Claimants who were TSs, favored the settlement. Mr. McNamara's objection solely seeks more money for himself at the expense of all other Claimants – clearly an effort to "thwart a result that is in the best interests" of the remaining Claimants. Mr. McNamara's remedy, if he believed he had additional overtime claims outside the scope of those pled in this

Complaint, was to Opt-out and pursue his claims independently. As such, Courts have routinely overruled these types of objections as the Court must do here.

       3.    <u>*Discovery Has Advanced Far Enough to Allow the Parties to Resolve the Case Responsibly (Grinnell Factor 3).*</u>

Although preparing this case through trial would require thousands more hours of discovery work for both sides, the Parties have completed enough discovery to recommend settlement. The proper question is "whether counsel had an adequate appreciation of the merits of the case before negotiating." *In re Warfarin Sodium Antitrust Litig*, 391 F.3d 516, 537 (3d Cir. 2004). "The pretrial negotiations and discovery must be sufficiently adversarial that they are not designed to justify a settlement . . . [but] an aggressive effort to ferret out facts helpful to the prosecution of the suit." *In re Austrian*, 80 F. Supp. 2d at 176 (internal quotations omitted).

For the detailed reasons put forth in Subsections A-D of Section I, *infra*, the Parties' negotiations and discovery more than meets this standard and this factor favors final approval. Specifically, Class Counsel has conducted extensive investigation of the claims in the lawsuit, including numerous interviews and follow up discussions with the Named Plaintiff and third-party witnesses and the review of thousands of pages of documents produced by Defendants. *Id.* at ¶¶ 18-28. Class Counsel has also reviewed and analyzed time and payroll data for the entire Rule 23 Class. *Id.* at ¶¶ 21. Defendants also propounded interrogatories and document requests on Mr. Douglas and had an opportunity to inquire as to his time as an ASA, OA and TS. *Id.* at ¶¶ 16, 98. Class Counsel, with the assistance of the Expert, analyzed documents and, based on such, prepared comprehensive damages analysis. *Id.* at ¶¶ 60-66. Finally, the Parties exchanged and debated legal arguments concerning certain highly contested points, and engaged in extensive settlement discussions, including two full-day mediation sessions. *Id.* at ¶¶ 67-81.

4.      *Plaintiffs Would Face Real Risks if the Case Proceeded*
        *(Grinnell Factors 4 and 5).*

Although the Named Plaintiff believes his case is strong, it is subject to considerable risk as to liability and damages. In weighing the risks of establishing liability and damages, the court "must only weigh the likelihood of success by the plaintiff class against the relief offered by the settlement." *In re Austrian*, 80 F. Supp. 2d at 177 (internal quotations omitted). A trial on the merits would involve significant risks.

With respect to liability, while the Named Plaintiff is confident in his ability to prove his case, Defendants have several defenses which could defeat the Named Plaintiff's effort to establish liability. Defendants' primary defense is factual: post-shift off-the-clock work at JFK occurred nowhere near as pervasively as alleged, and, for the majority of shifts and/or post assignments, it did not occur at all. Specifically, Defendants' counsel spent days on-site at JFK observing ASA's returning to Building 14 at the end of their shifts, interviewing current employees, and conducting a traffic analyses to determine travel times between Building 14 and relevant posts. *See* DE 46-13. Based on such observations and interviews, Defendants' believe Plaintiff's estimates as to off-the-clock work were overstated, if not wholly incorrect. *Id.* at ¶¶ 6-9.

Defendants believe their on-site observations revealed that the overwhelming majority of shifts were worked at Guard Posts with no issues with post-shift work. *Id.* at ¶¶ 6, 8. These include fixed Guard Posts inside of Building 14; fixed Guard Posts that are located in the immediate vicinity of Building 14; and self-relieving Guard Posts, where officers do not need to wait for a relief officer to end their shift. *Id.* at ¶ 6. ASAs working at these Guard Posts regularly return to Building 14 early or, at the latest, on time. *Id.* at ¶¶ 8-9. To the extent that late returns did occur, Defendants believe that post-shift work was limited to a small number of Guard Posts and was far less frequent and involved less post-shift time than Plaintiff alleges. *Id.* at ¶¶ 8–9.

Additionally, TSs and OAs both begin and end their shift within the confines of Building 14 and are immediately relieved by an incoming TS or OA at the end of their shift. Thus, Defendants believe that they will be able to show the amount of unpaid time worked by TSs and OAs was either significantly less than Plaintiff alleges or non-existent. *Id.* at ¶ 11. With regard to conference calls in which TSs participated, Defendants argue that those calls did not occur nearly as frequently as Plaintiff contends, were of brief duration, and were voluntary. *Id.*

Obviously, another defense is that if employees were paid, there is no liability for post-shift work. Discovery revealed that ASAs and/or their supervisor would often record additional time on the "roll call" sheets (used for timekeeping) to account for time worked beyond the end of their shift, so that ASAs would be paid for that time. *Id.* at ¶ 8. Further, to the extent that time was not recorded on the "roll call" sheet or a timekeeping error occurred, employees could submit a payroll discrepancy form to request compensation for the time worked. *Id.* at ¶ 5.

As for the ASAs' lunch break claims, they received a 50-minute meal break each shift, only 30 minutes of which is unpaid time. *Id.* at ¶ 10. Defendants contend that it did not take more than 10 minutes, each way, to drive to a location, whether Building 14 or one of the other dining options on JFK's property, where the ASAs could eat. *Id.* Additionally, Defendants argue that even when an employee must drive more than a few minutes to take his meal break, time spent in travel generally is not compensable because it was not "predominantly for the benefit of the employer." *See Perkins v. Bronx Lebanon Hosp. Ctr.*, Case No. 14 Civ. 1681, 2016 WL 6462117, at *4 (S.D.N.Y. Oct. 31, 2016), *report and recommendation adopted*, 715 F. App'x 103, 104 (2018); *see also* DOL Opinion Letter, Fair Labor Standards Act, 2006 WL 4512943, at *1 (DOL Wage-Hour Jan.17, 2006) (addressing an automatic 30-minute deduction for lunch and stating, "Normally, if the employee uses the employer's vehicle to travel to a lunch location, the

half-hour lunch period begins when the employee leaves [the place of work] and ends when the employee returns to the [the place of work].")

Alternatively, Plaintiff believes he will be able to establish liability for unpaid overtime hours for which he and the class was not properly compensated, and that Defendants had actual or constructive knowledge of that work. *See Kosakow v. New Rochelle Radiology Associates, P.C.*, 274 F.3d 706, 718 (2d Cir. 2001), *citing* 29 C.F.R. § 785.11 (an employee must be compensated for time worked outside his scheduled shift, even if the employer did not request that the employee work, "so long as the employer knows or has reason to believe that the employee is continuing to work, and that work was "suffered or permitted" by the employer.").

Moreover, Plaintiff will argue that the only realistic option for lunch was to return to Building 14 and that such employer-mandated travel time to a specific location in order to take a meal break, is not predominantly for the employee's benefit, and therefore is compensable time. *See Naylor v. Securiguard, Inc.*, 801 F.3d 501, 506-508 (5th Cir. 2015) (citing Second Circuit precedent in *Reich* to hold that employer-mandated drive time during a meal break is for employer's benefit and that "preventing the employee from eating – ostensibly the main purpose of the break… is a meaningful limitation on the employee's freedom" such that the time cannot be considered part of an uncompensated meal break). Thus, when the amount of driving time from the more remote posts cut significantly into the plaintiffs' unpaid meal break then the entire break must be compensated. *See Castillo v. Perfume Worldwide Inc.*, 17-cv-2972, 2018 WL 1581975, at *7 (E.D.N.Y. 2018) (employer's failure to count a break of 20-minutes or less towards an employee's working hours violates the FLSA). Finally, given Plaintiff's allegation that Defendants failed to record all the hours worked, Plaintiff will argue that they are therefore entitled to the lenient *Anderson* standard to estimate damages. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S.

680, 687 (1946) (when "the employer's records are inaccurate or inadequate" the employee has "carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."). An employee may meet this standard through estimates based on his own recollection and courts have held that "when choosing between an over inclusive estimate by an employee and an under inclusive one by an employer, it is not unreasonable for a district court to adopt the employee's estimate." *Doo Nam Yang v. ACBL Corp.*, 427 F. Supp. 2d 327, 339 n. 17 (S.D.N.Y. 2005).

Since both parties are well represented by highly competent counsel who are specialized in the area of complex wage and hour litigation, they would each pursue all such potential claims and defenses and raise multiple strategic and procedural issues in the course of the litigation, making the outcome of Plaintiff's claims uncertain and the period of litigation lengthy, weighing strongly in favor of settlement.

5.      *Establishing a Class and Maintaining it Through Trial Would Not Be Simple (Grinnell Factor 6).*

The Named Plaintiff similarly believes that he could obtain class certification in contested proceedings; however, recognizes that this issue also presents a considerable risk.

Should the Court deny approval for the settlement, Allied will undoubtedly contend that contested litigation of the class claims will not be manageable or appropriate. The Named Plaintiff believes this case is well suited for class or collective treatment; however, he has not yet moved for preliminary FLSA certification or Rule 23 class certification, and any such motion(s) would undoubtedly be contested. While the first stage of conditional FLSA certification only requires the Named Plaintiff to make a "modest factual showing" that he and potential opt-in plaintiffs were together victims of a common policy or plan that violated the law, the second stage applies "heightened scrutiny" in determining whether the putative collective members are similarly

situated for the purposes of the FLSA. *Desilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 27 F. Supp. 3d 313, 319 (E.D.N.Y. 2014). At the second stage, in addition to whether a "common policy or plan that violated the law" exists, the E.D.N.Y. also analyzes the following factors to determine whether a case is appropriately maintained as a collective action: "(1) disparate factual and employment settings of the individual plaintiffs; (2) defenses available to defendants which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *Laroque v. Domino's Pizza, LLC,* 557 F.Supp.2d 346, 352 (E.D.N.Y. 2008).

The Named Plaintiff believes his claims will be certified both as a NYLL class action under Fed. R. Civ. P. 23 and as an FLSA collective action under 29 U.S.C § 216(b) based on uniform unlawful policies – namely, requiring Plaintiff and the putative class and collective to work "off-the-clock" and not compensating them for such time. Notably, the Named Plaintiff's theory of certification is based in part on a "no non-billable overtime" policy, which he alleges was a common practice of Defendants and is facially unlawful, and which are regularly certified without meaningful decertification. *See Acevedo v. WorkFit Medical LLC*, No. 14-cv-6221, 2014 WL 4659366, at *12 (W.D.N.Y. Sept. 17, 2014) (certifying an unpaid overtime class and finding *Dukes* decertification reasoning inapplicable to classes certified pursuant to "no overtime" policies).

Alternatively, Defendants will argue: (i) Defendants have never had a common policy that violated the FLSA and instead maintain company policies and training materials that emphasize that they pay all employees for all hours worked; and (ii) that the various positions, duties, responsibilities, locations/posts, shifts, and supervisors related to the putative class members' jobs at JFK are so different that a determination of whether, when, and how much they worked off-the-clock or were denied meal breaks would require individualized determinations, making certification and ultimately a trial on a class-wide basis impractical.

Finally, Allied will argue that the TS Class does not have sufficient class members to reach the numerosity requirement for purposes of class certification. *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (numerosity presumed at 40). While there are circumstances where courts have certified smaller classes, it is certainly not without risk to

proceed. In short, while the Named Plaintiff continues to believe these claims could proceed on a class basis, he recognizes that Allied has presented arguments that pose a significant risk to the chances for certification, and this favors preliminary approval.

> 6. _Defendants' Ability to Withstand a Greater Judgment is Not at Issue (Grinnell Factor 7)._

Allied's ability to withstand a greater judgment is currently not at issue. Even so, a "defendant's ability to withstand a greater judgment, standing alone, does not suggest that the settlement is unfair." _In re Austrian_, 80 F. Supp. 2d at 178 n.9.

> 7. _The Settlement Funds are Substantial, Even in Light of the Best Possible Recovery and the Attendant Risks of Litigation (Grinnell Factors 8 and 9)._

Class Counsel has determined that this case presents significant risks that militate toward substantial compromise. Allied has agreed to settle this case for a substantial amount, up to $2,520,000. Ex. 1 at ¶ 2.28. The settlement amount represents a good value given the attendant risks of litigation, even though recovery could be greater if the Named Plaintiff succeeded on all his claims at trial and such a result survives an appeal. In Class Counsel's estimation, the settlement represents a meaningful percentage of the recovery that the Class Members would have achieved had they prevailed on all their claims, survived an appeal, and sought to enforce and collect upon a judgment. Davis Decl. at ¶ 77.

The determination of whether a settlement amount is reasonable "does not involve use of a 'mathematical equation yielding a particularized sum.'" _Frank,_ 228 F.R.D. at 186 (quotation omitted). "Instead, 'there is a range of reasonableness with respect to a settlement—a range which recognized the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion.'" _Id._ (quoting _Newman v. Stein_, 464 F.2d 689, 693 (2d Cir. 1972)).

Here, each Claimant and Opt-in Claimant will receive a meaningful settlement payment based upon his or her length of time working for Allied and his or her daily post assignments as either an ASA, OA, and/or TS during the Class or Collective Period. Ex. 1 at ¶¶ 4.3; 4.4. As explained in detail above, the amount that each Claimant and Opt-in Claimant will receive reflects a careful balancing of the strengths of the underlying claims and the very real risks that those claims would not ultimately prevail. Allied has insisted, and will continue to insist, that they are not liable to the Named Plaintiff or the Classes/Collectives on any of the claims. Weighing the benefits of the settlement against the risks associated with proceeding in the litigation, the Named Plaintiff respectfully submits that the settlement amount is reasonable. *See* Section I(D), supra (setting forth the estimated settlement value on the dollar obtained in this case).

Accordingly, all the *Grinnell* factors weigh in favor of final approval of the settlement. Because the settlement, on its face, is "'fair, adequate, and reasonable, and not a product of collusion,'" *Frank*, 228 F.R.D. at 184 (quoting *Joel A. v. Giuliani*, 218 F.3d 132, 138-39 (2d Cir. 2000)), the Court should grant Final Approval.

## V.    THE COURT SHOULD APPROVE THE FLSA SETTLEMENT PURSUANT TO *CHEEKS*.

Class Counsel, on behalf of the Class Members also respectfully request that the Court certify the settlement class under the FLSA for purposes of effectuating the settlements. Since under an FLSA settlement, "parties may elect to opt in but a failure to do so does not prevent them from bringing their own suits at a later date," FLSA collective actions do not implicate the same due process concerns as Rule 23 actions. *See McKenna v. Champion Intern. Corp.,* 747 F.2d 1211, 1213 (8th Cir.1984); *Reyes v. Altamarea Grp., LLC*, No. 10 Civ. 6451, 2011 WL 4599822, at *3 (S.D.N.Y. Aug. 16, 2011). Accordingly, the standard for approval of an FLSA settlement is lower than for a class action under Rule 23. Courts approve FLSA settlements when they are reached as

a result of contested litigation to resolve bona fide disputes. *See Lynn's Food Stores, Inc. v. U.S.*, 679 F.2d 1350, 1353 (11th Cir. 1982); *see also Reyes*, 2011 WL 4599822, at *6. Typically, courts regard the adversarial nature of a litigated FLSA case to be an adequate indicator of the fairness of the settlement. *Id.* at 1353–54.

If the proposed FLSA settlement reflects a reasonable compromise over contested issues, it should be approved. *Id.* at 1354; *Reyes*, 2011 WL 4599822, at *6. *See Wolinsky v. Scholastic, Inc.* 900 F. Supp. 2d 332, 335 (S.D.N.Y. 2012); *see also Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199, 206 (2d Cir. 2015). "Courts approve FLSA settlements when they are reached as a result of contested litigation to resolve *bona fide* disputes." *In re Penthouse Executive Club Compensation Litig.*, 2014 WL 185628, at *7 (S.D.N.Y. Jan. 14, 2014) (noting that the inherent adversarial nature of a litigated FLSA case is an adequate indicator of fairness of settlement). In considering whether a settlement is fair and reasonable, the principal question is "whether the agreement reflects a 'reasonable compromise of disputed issues [rather] than a mere waiver of statutory rights brought about by an employer's overreaching.'" *Le v. SITA Info. Networking Computing USA, Inc.*, 2008 WL 724155, at *1 (E.D.N.Y. Mar. 13, 2008) (quotation omitted).

In evaluating the settlement of the FLSA claims, this Court should consider the totality of the circumstances, including the following factors: (1) the range of possible recovery; (2) the extent to which the settlement enables the parties to avoid the burdens and expenses in establishing their claims and defenses; (3) the seriousness of the litigation risks; (4) whether "the settlement agreement is the product of arm's-length bargaining between experienced counsel"; and (5) the possibility of fraud or collusion. *See Wolinsky*, 900 F. Supp. 2d at 335.

As set forth in Section IV, *supra*, the settlement: (1) is substantial and is within the range of reasonableness of recovery when compared to the various possibilities of recovery in light of

- 41 -

the litigation risks faced; (2) avoids the burden and expense of discovery and a trial on the merits that would have an uncertain potential outcome; (3) eliminates the serious litigation risks faced, including certification and decertification risks; (4) was reached with the help of a third-party neutral and resolved through an arm's-length settlement process with attorneys well-versed in complex wage and hour litigation; and (5) was reached by and through experienced counsel who were able to fully evaluate the strengths and weaknesses of the claims and defenses. As such, settlement of the FLSA claims in this case meet the *Cheeks* "fair and reasonable" standard. *See* 796 F.3d at 206.

**CONCLUSION**

For the reasons set forth above, Plaintiffs respectfully request that the Court enter the Order granting final approval of the settlement. (Class Counsel's request for an award of costs and fees is separately submitted, and Allied does not oppose that request.)

Dated: March 13, 2020
    New York, New York

Respectfully submitted,

    /s/
Christopher Q. Davis
Rachel M. Haskell
**The Law Office of Christopher Q. Davis**
80 Broad Street, Suite 703
New York, New York 10004
Telephone: (646) 430-7930
*Class Counsel*